[No. B159157. Second Dist., Div. Four. Oct. 30, 2002.]

NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Roger Beers; Jan Chatten-Brown, Douglas P. Carstens; Gail Ruderman Feuer and Julie Masters for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Theodora P. Berger, Assistant Attorney General, Craig C. Thompson and Susan L. Durbin, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Rockard J. Delgadillo, Richard M. Helgeson, William L. Waterhouse; Morrison & Foerster, Michael H. Zischke, Scott B. Birkey and Peter Hsiao for Defendants and Respondents.

**OPINION**

**HASTINGS, J.**—This case involves construction of a container terminal for the China Shipping Holding Co. (China Shipping), which we reference as the China Shipping project, or Project. The China Shipping project is the subject of a lease/permit entered into between China Shipping and the City of Los Angeles (City) on May 8, 2001. The Project contemplates three phases of construction for which the Port of Los Angeles granted a coastal development permit on October 10, 2001.

The China Shipping project was challenged by filing of a petition for writ of mandate in the Los Angeles County Superior Court asserting that the Project was violative of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)).[1] The challengers are two non-profit environmental groups, the Natural Resources Defense Council, Inc., and Coalition for Clean Air, Inc., and two homeowners associations, the San Pedro and Peninsula Homeowners' Coalition and San Pedro Peninsula Homeowners United, Inc. (collectively appellants). Appellants appeal from denial of their petition contending that the City violated CEQA by failing to prepare a separate environmental impact report (EIR) addressing all three phases of the Project before entering into the lease/permit with China Shipping. As a backup argument, appellants contend an EIR "tiered" from a 1997 "program EIR" prepared by the City should have been prepared addressing all three phases of the Project.

The City responds that the China Shipping project falls within the scope of the original 1997 program EIR and a subsequent environmental impact statement/EIR (SEIS/SEIR) completed in September 2000.

---

[1] Further statutory references will be to the Public Resources Code unless otherwise noted.

We have reviewed the administrative record, the record from the trial court proceedings, and briefing by the parties, including an amicus curiae brief filed by the California Attorney General supporting appellants' position. We conclude that the City did fail to follow the dictates of CEQA and we reverse the trial court judgment. We remand with directions that the trial court order the City to prepare a project-specific EIR that covers all three phases of the Project. We also direct the trial court to issue an injunction consistent with a stay we have issued precluding further construction or operation of the Project pending completion of the environmental review process.

An excerpt from the "Introduction" of the amicus curiae brief filed by the Attorney General provides a succinct statement why CEQA was violated:

"This case goes to the first principles of CEQA. The CEQA process is intended to be a careful examination, fully open to the public, of the environmental consequences of a given project, covering the entire project, from start to finish. This examination is intended to provide the fullest information reasonably available upon which the decision makers and the public they serve can rely in determining whether or not to start the project at all, not merely to decide whether to finish it. The EIR is intended to furnish both the road map and the environmental price tag for a project, so that the decision maker and the public both know, before the journey begins, just where the journey will lead, and how much they—and the environment—will have to give up in order to take that journey. As our Supreme Court said in *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017], '[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind.'[2]

"Here, the Port and the City have reduced CEQA to a process whose result will be largely to generate paper, to produce an EIR that describes a journey whose destination is already predetermined and contractually committed to before the public has any chance to see either the road map or the full price tag. [The City and Port] have segmented the project into three phases and are in the process of preparing an EIR for Phases II and III separately from Phase I, while engaged in building Phase I during the course of litigation. However, prior to the EIR for Phases II and III being complete, before a draft is even finished or available to the public, the City and the Port have committed themselves to *all* Phases of the China Shipping project, by

---

[2]*Bozung* was superceded by statute with respect to the issue of designation of a lead agency. (*City of Redding v. Shasta County Local Agency Formation Com.* (1989) 209 Cal.App.3d 1169, 1177 [257 Cal.Rptr. 793].)

approving the lease and the terms of the lease that call for construction of the entire project. They have signed this legally binding lease for the *entire* project before completing the CEQA process for two of its three Phases. Under the statute's plain language, the Guidelines [(Cal. Code Regs., tit. 14, § 15000 et seq.)] adopted by the Resources Agency and binding on the City and the Port, and 'a long line of cases covering decades of CEQA enforcement, this is segmentation of the project and a *per se* violation of the statute."

FACTS

*1997 Program EIR*

In 1997 the Los Angeles Harbor Department (LAHD), as lead agency, completed a program EIR for what was described as the West Basin Transportation Improvements Program (WBTIP) for the Port of Los Angeles. The overall goal of the WBTIP was to improve containerized cargo handling and the overall operating "efficiency of West Basin container terminals." The area that was the subject of the EIR was divided into berths 97-109, berths 121-131, berths 136-139 and berths 142-147.

The WBTIP was described in the EIR as being initiated "to investigate optimization measures given that a number of changes are already in progress." The changes included relocation of American President Lines from berths 121-126 to Terminal Island by early 1997, and the West Basin Widening Project to improve vessel safety in the West Basin and to provide potential for a new berth, 97-98, capable of accommodating the largest of container vessels. A related project was described as the Harry Bridges Boulevard Project affording opportunity for an improved road and rail system to connect the berth and backland areas of the West Basin to the proposed Alameda Corridor. It included grade separation projects to eliminate vehicle-rail conflicts and an access route for trucks within the Port area to connect to the Alameda Corridor and the freeway system.

The EIR predicted that containerized cargo transport through the Port of Los Angeles would more than double by the year 2020 and that actual increases had greatly exceeded forecasts. It provided: "To meet this demand the LAHD has embarked on several major development programs to (1) optimize existing cargo handling capability on existing Port lands, (2) create additional lands and build new marine terminals through landfill development, (3) facilitate cargo movement by improving ship channels and landside transportation . . . to optimize container transport capabilities, and (4) to optimize transportation infrastructure identified in the Knoll Hill EIR (LAHD 1978) and the Harry Bridges Boulevard Project (LAHD 1994)."

The 1997 EIR contemplated two phases of construction. Phase I involved construction of a railyard at berths 97-109, two lead tracks and a railyard access roadway at berths 121-131, and one lead track at berths 136-139. Berths 97-109 were to be improved by construction of new entrance gate facilities and a new 1,000-foot wharf at berths 98-100. There was also to be realignment, extension and filling over a storm drain in the western portion of the project area to provide additional space for a new access roadway alongside the West Basin railyard. Berths 121-126 and 127-131 were to be consolidated into one large terminal so that the wharf could accommodate larger ships either by reconstructing 2,000 feet of existing wharf and constructing 1,000 feet of new wharf to the north of existing wharves, or by constructing 1,000 feet of new wharf to the south at berths 120-121. Adjacent portions of the channel would be dredged to increase depth from approximately 40 feet to 50 feet. There would also be construction of a grade separation at Neptune Avenue adjacent to berths 136-139 and 142-147 and relocation of the entrance gates at each terminal. Berths 142-147 would be converted into a container terminal, and backland storage would be expanded by bringing berth 147 up to grade with berths 142-146 and paving, removing existing railyard trackage from pier A and paving as needed, and increasing available spaces at berths 153-155 by demolishing one transit shed and part of another and paving as needed.

Specifically, with regard to berths 97-109, the EIR provided: "Completion of the West Basin Widening Project in 1996 will provide the Berths 97-109 area with adequate channel depth to serve modern vessels. The proposed project would include a new single-berth wharf at Berths 98-100. The new wharf would measure approximately 300 meters (1,000 feet) in length. Equipment and infrastructure would be added to ensure efficient movement of cargo. Improvements required to operate the terminal at projected levels are consistent with existing requirements regarding this property and would require no additional environmental assessment (e.g., lighting, fencing, and surface improvements). [¶] . . . [¶] The West Basin container terminals would be served by a new railyard located at Berths 97-109. The railyard would require approximately 10 hectares (24 acres) and would consist of four working tracks, four storage tracks, one maintenance track and one run-around track. It will be able to accommodate two unit trains per day."

Phase II focused on berths 97-109 and was considered optional. It would proceed only if needed because of business conditions or transportation needs. It contemplated acquiring properties on Knoll Hill not already owned by the Port of Los Angeles, removing Knoll Hill, realigning Front Street and the Harbor Belt Line, paving as needed to provide additional backland

storage area, relocating entrance gate facilities to the center of the terminal, and building a grade separation at Pacific Avenue.

The environmental impact assessment was based on construction and operation of the entirety of the West Basin improvement project, berths 97-109, 121-131, 136-139 and 142-147.

The 1997 EIR provided:

"This document is a Program EIR. The CEQA Guidelines ([Cal. Code Regs., tit. 14 §] 15168) recommend that a Program EIR be prepared for a series of actions that can be characterized as one large project and are related either (1) geographically; (2) as logical parts in the chain of contemplated actions; (3) in connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program; or (4) as individual actions carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects that can be mitigated in similar ways.

"Specific activities that comprise the WBTIP will be examined by the LAHD in the light of this Program EIR to determine whether an additional environmental assessment must be prepared. If it is found that a later activity would have effects that were not examined in this Program EIR, a new Initial Study would need to be prepared. This would lead to an additional CEQA assessment or a Negative Declaration. If the LAHD finds that no new effects would occur or no new mitigation measures would be required, it could approve the activity as being within the scope of the project covered by the Program EIR, and no new environmental documentation would be needed. . . . Where subsequent activities involved site-specific operations, the LAHD would use a written checklist or similar device to document the evaluation of the site and the activity to determine whether the environmental effects of the operation were covered in the Program EIR."

*2000 SEIS/SEIR*

In September 2000, the United States Army Corps of Engineers, Los Angeles District (USACE), finalized the SEIS/SEIR, titled "Port of Los Angeles Channel Deepening Project." The purpose of the SEIS/SEIR was to analyze "project-specific impacts of deepening the Inner Harbor channels of the Port of Los Angeles to accommodate the most modern vessels in the commercial container fleet." The SEIS/SEIR was prepared in contemplation that it would be used in connection with a feasibility study (FS) to "serve as the Biological Assessment in association with the Federal Endangered Species Act." It then set out the "Intended Uses" of the SEIS/SEIR:

"An FS is being conducted by LAHD and USACE in accordance with Section 203 of the Water Resources Development Act of 1986 (P.L. 99-662). The purpose of the FS is to determine the federal interest in deepening the Main Channel of the Port and to determine the project design that can be designated the National Economic Development (NED) Plan; i.e., that plan that has the greatest net economic benefit consistent with protecting the nation's environment.

"This SEIS/SEIR supports the proposed federal actions described in the FS. The USACE's Record of Decision (ROD) resulting from consideration of the FS and this SEIS/SEIR will formally document USACE's decision on the proposed action. . . . [¶] . . . [¶]

"LAHD may also use this assessment as a basis for later approval of portions of a project not identified in the Recommended Plans. Specifically this could include construction of approximately 75 acres of fill at the Southwest Slip (see Alternative -53'-8) or construction of up to 80 acres of fill at the Pier 300 expansion area (see Alternative -53'-1).

"The LAHD seeks federal participation in deepening channels of the Inner Los Angeles Harbor and placing dredge material at a number of disposal sites. Disposal at some sites would create new landfills that would provide additional backlands for existing container terminals. The LAHD would use this document for discretionary actions associated with the proposed project. The LAHD may use the SEIS/SEIR as a basis for obtaining Department of Army and other permits necessary to construct the proposed project should the LAHD elect to proceed in advance of the USACE in construction of part or all of the proposed project.

"The SEIS/SEIR also will be used by the LAHD for obtaining necessary Port Master Plan Amendments from the California Coastal Commission."

Under "Purpose and Need," the SEIS/SEIR noted that a newer generation of container ships was being developed with drafts expected of up to 52 feet and that a "deeper channel is necessary to provide these ships with adequate under-keel clearance to accommodate vessel design requirements." The SEIS/SEIR reviewed the history of development of the Port of Los Angeles and various projects to improve the port beginning in 1992, including "the West Basin Transportation Improvements Project."

Specifically, the SEIS/SEIR identified four areas that would receive the dredged material for fill, one of which was identified as the proposed "Southwest Slip Fill Site." This is located between berths 97-109 and

121-131, within the WBTIP, which was the subject of the 1997 program EIR. It identified two possible uses of the fill at this location. The first would be a disposal site "to create approximately 35 acres of new land . . . [which] . . . could be used as a Confined Disposal Facility for contaminated dredge material . . . [and] for container terminal storage." The alternative was to "construct a larger (75-acre) landfill to provide more backlands and allow construction of an additional container wharf." But this "would only be implemented if the GATX facility at Berths 118-119 were to be made a remote facility, relocated, or decommissioned."

Regarding future use of this fill area, the SEIS/SEIR stated: "Depending on the alternative, new container terminal backlands would vary from 35 to 115 acres in size and would have a maximum throughput capacity of approximately 120,500 to 396,000 containers per year (see Table 1.5-5). The container terminal backlands would operate 260 days per year. The number of employees required to operate new backlands would vary according to disposal alternative, as shown on Table 1.5-5."

Table 1.5-5 provided estimated alternative impacts for different acres given different dredging depths in four categories: "Annual Throughput Capacity (containers)"; "Truck Operations (daily trips)"; "Rail Operations (railcars)"; and "New Container Terminal Employees (day/night)." For each depth, the same impacts were estimated if the 35-acre option would be utilized: 120,462 additional containers; 378 additional daily truck trips; 17 additional railcars; and 34/12 day/night employees.

Based on the exhibits attached, the fill would be placed in the current channel between berths 97-109 and 121-131. If the 35-acre option were elected, it would add fill to berths 97-109 toward berths 121-131. If the 75-acre option were used, it would completely fill in the channel between berths 97-109 and 121-131.

The SEIS/SEIR addressed the potential environmental impact of the dredging and filling operations as well as the estimated environmental impacts of operations on the 35-acre fill option if it were to be utilized for container storage based on depths of between -50 feet MLLW (mean lower low water) and -53 feet MLLW. The amount of cargo handled for each depth was expected to be the same, "205,000 TEU's" (20-foot equivalent units). Additional assumptions were made. As pertinent, it was assumed that "[c]ontainer vessel loading and unloading operations would occur during two eight-hour shifts per day when a ship is at berth. Vessel hoteling durations were calculated by multiplying the vessel service time by 24

hours/16 hours. Since cargo handling operations would occur for two eight-hour shifts per day, the vessel would be at berth in stand-by mode for the remaining eight hours of a day. . . . [¶] . . . Two tugboats would assist the berthing of each container ship for a total of 2.3 hours per ship visit. [¶] . . . The yard equipment associated with this activity would include two rubber-tired gantry cranes, two top picks, and 24 hostlers, all diesel-powered. [¶] . . . [¶] It is expected that by completion of the -50' MLLW channel, larger and fewer vessels would ship container cargo through the Port."

On November 22, 2000, the Board of Harbor Commissioners of the City of Los Angeles approved the LAHD's Port of Los Angeles Channel Deepening Project.

*The China Shipping Project*

In 2001, China Shipping was an invitee of Yang Ming Marine Transport Corporation, which had a lease for its own container terminal in the Port of Los Angeles at berths 127-131. China Shipping grew, and consequently requested to lease its own terminal at the port.

The LAHD negotiated a long-term lease with China Shipping "for development and use of waterfront properties in the former Todd Shipyard and Chevron areas of the West Basin in the Port of Los Angeles," which contemplated construction of improvements for and operation of a container facility at berths 100 and 102. The lease was to be effectuated by issuance of a permit to China Shipping.

On February 26, 2001, an environmental assessment for the terminal proposed by China Shipping was requested. On March 27, the LAHD issued a memorandum stating that the assessment was completed, and that the "elements contained in the lease have been adequately assessed in the [1997] West Basin Transportation Improvements Program EIR . . . and have been adequately assessed in the [2000] Port of Los Angeles Channel Deepening EIS/EIR. . . . As such, the Director of Environmental Management has determined that the proposed activity is exempt" from CEQA.

Meanwhile, on March 8, 2001, a City memorandum indicated that a proposed permit regarding the three-phase construction project was approved by the Los Angeles City Attorney's Office and accepted by China Shipping. The memorandum stated that the landfill will come from the dredge from the channel deepening project approved in the 2000 SEIS/SEIR. The memorandum stated, "Due to interference that ongoing phased construction will have on [China Shipping's] operations, . . . completion of the two-berth, 110-acre terminal . . . is anticipated to be March 2005."

On March 28, 2001, the Board of Harbor Commissioners of the City of Los Angeles adopted order No. 6722 approving permit No. 999.

Permit No. 999, called an "Agreement," was entered into between the City and China Shipping on May 8, 2001. It granted China Shipping the "preferential right" to use berths 100 and 102 and approximately 110 acres of wharf and backlands, and the "secondary right" to use berths 121-131 under permit No. 787. It was for a term of 25 years and contemplated a three-phase project. Phase I contemplated delivery of a container terminal of 75 acres at berth 100 with a wharf of 1,200 feet in length to be delivered no later than November 2002.[3] Phase II contemplated an addition of 200-400 lineal feet to berth 100 and placing 35 acres of dredge material for landfill contiguous to berth 100 for the addition of berth 102, anticipated to be completed by March 2005.[4] Phase III contemplated future expansion and provided that the City would make available a minimum of 24 acres of backland contiguous to the terminal area.

Each berth was to be constructed to accommodate a 9,100-TEU vessel. Phase I contemplated installation of four cranes for the initial 1,200 feet of wharf. An additional crane was expected upon delivery of the second wharf, and a total of 10 cranes after completion of both berths. Necessary supporting infrastructure was also contemplated.

Acknowledging that China Shipping "does not directly control the trucks serving the terminal," the permit nevertheless provided that China Shipping "will make its best effort to notify truck drivers, truck brokers and trucking companies, that trucks serving the terminal must confine their route to the designated Wilmington Truck Route of Alameda Street and 'B' Street; Figueroa Street from 'B' Street to 'C' Street; and Anaheim Street east of Alameda Street."

Soon after permit No. 999 was entered into, on May 15, 2001, the City prepared a notice of determination. The notice stated that on May 9, 2001, the Los Angeles City Council approved the project and determined that the approval was part of the WBTIP analyzed in the 1997 EIR and the Port of Los Angeles Channel Deepening Project analyzed in the 2000 SEIS/SEIR. The notice further stated that the city council "has determined that no additional CEQA document should be prepared in connection with" approval of the China Shipping project, and that mitigation measures "were previously adopted and will be imposed in connection with construction and operation at the site."

[3]This is not the same 75 acres contemplated with the 2000 SEIS/SEIR.
[4]This is similar to the 35-acre option contemplated in the 2000 SEIS/SEIR.

Apparently concerned that not all environmental issues had been addressed, the City and China Shipping entered into a "side letter agreement" which was approved by the city council on July 18, 2001. The letter agreement specifically addresses concerns related to operation of the China Shipping Terminal as follows: emissions from container ships entering, maneuvering and hoteling in the harbor; emissions from tugboats assisting ships to the China Shipping Terminal; emissions and congestion from container traffic at the terminal; emissions and congestion of truck traffic to and from the terminal; availability of off-peak delivery service to and from the terminal; and emissions resulting from use of "On-Dock" equipment. The letter provides that China Shipping and the Port will use their best efforts to minimize negative environmental impacts in these areas of concern.[5]

On October 10, 2001, the Port of Los Angeles granted a coastal development permit to begin construction of phase I, the container terminal at berth 100.

*The Superior Court Proceedings*

Opposed to the China Shipping project, appellants petitioned the superior court for a writ of mandate seeking to have the court set aside approval of the coastal development permit for phase I of the China Shipping project and to enjoin respondents from "taking any action to construct any wharves, buildings or structures or to develop or alter the Project site in any way until a lawful approval is obtained from Respondents after the preparation and consideration of an EIR."

The trial court agreed with respondents that phase I of the Project was covered by the 1997 program EIR and denied the relief requested. As pertinent, we quote from the trial court's written decision regarding its rationale: "As noted earlier, Respondent here contends that § 21166 and substantial evidence test apply herein rather than § 21094(c), because Phase

---

[5]For example, one of the items promised by China Shipping states: "Marine container vessels owned by China Shipping Line will study the feasibility of joining in the NOx Engine Standards for Ocean Going Marine Vessels adopted by the International Maritime Organization as part of Annex VI of MARPOL 73/78. If feasible, marine container vessels owned by China Shipping Line will apply for EPA certified 'Statement of Voluntary Compliance to the MARPOL Annex VI NOx Limits." (We omit a footnote reference to "International Maritime Organization of the United Nations, 1997, MARPOL 73/78, Annex VI—Marine Diesel Engine Requirements.") One of the items the Port of Los Angeles committed to was to "support regulatory and legislative changes that will assist China Shipping, and all other terminal operators, in making the transition to cleaner fuels and engines."

I of the China Shipping Terminal project is within the scope of the project, program or plan described in the 1997 WBTIP Program EIR. *Respondent acknowledges that additional environmental evaluation is required as to Phases II and III.*" (Italics added.) The decision closed as follows: "As Respondent acknowledges that an EIR is required for Phases II and III of the China Shipping Project, the Petition for Writ of Mandate as regards said phases is moot and/or premature. [¶] The Petition for Writ of Mandate is denied."

*Court of Appeal Proceedings*

Appellants filed a petition for writ of supersedeas seeking to stay construction and operation of the China Shipping project during the appeal process. On August 2, 2002, we conducted a hearing on the matter and denied the request but ordered the appeal expedited and set it for hearing on October 18, 2002.

On October 18, after hearing argument, we indicated an intent to issue a stay on our own motion pursuant to Code of Civil Procedure section 923 and we asked counsel to provide us further briefing.[6] We received further briefing, including declarations, on October 21, 2002.

On October 23, 2002, we issued the following stay, currently in effect:

"Pursuant to Code of Civil Procedure section 923, and pending further order by a court of competent jurisdiction, the court hereby issues a stay effective immediately of portions of the China Shipping Project which is the subject of appeal No. B159157, as follows:

"1. Completion of the wharf at Berth 100 beyond 1,000 feet, currently estimated to be completed by December 20, 2002;

"2. Erection and operation of the cranes currently scheduled to be delivered within the next few weeks;

"3. Operation of Phase I of the China Shipping Project;

"4. Construction and operation of Phases II and III of the China Shipping Project.

---

[6]That section provides: "The provisions of this chapter shall not limit the power of a reviewing court or of a judge thereof to stay proceedings during the pendency of an appeal or to issue a writ of supersedeas or to suspend, or modify an injunction during the pendency of an appeal or to make any order appropriate to preserve the status quo, the effectiveness of the judgment subsequently entered, or otherwise in aid of its jurisdiction."

"This stay does not prevent: completion of the storm drain system; completion of the backlands including security fences, permanent lights and power; use of the backlands for container storage; offloading and storage of the cranes at Berth 100."

## Discussion

██ The essential issues to be addressed are fairly simple: whether the China Shipping project falls within the scope of prior environmental review; and, if so, what further environmental review is required, if any, before the port completes the Project.

Appellants argue that the 1997 program EIR was insufficient to encompass any portion of the China Shipping project and that a separate EIR is required pursuant to section 21151 addressing all three phases of the Project. As a fall back position, appellants argue that the program EIR qualifies only as the first step of "tiered" environmental review pursuant to section 21094 and that a complete "project" EIR must be prepared in connection with all three phases of the China Shipping project.

As noted above, the port convinced the trial court that the 1997 program EIR covered phase I of the Project and that any further review was controlled by section 21166. Before us, the port argues that the 1997 EIR and the 2000 SEIS/SEIR are sufficient to cover all phases of the Project. The port's position is supported neither factually nor legally.

Subdivision (a) of section 15168 of California Code of Regulations, title 14 (Guidelines) defines a "program EIR" as "an EIR which may be prepared on a *series of actions* that can be characterized as one large project and are related either: [¶] (1) Geographically, [or] [¶] (2) As logical parts in the chain of contemplated actions." (Italics added.) The 1997 EIR generally addresses improvements contemplated within the WBTIP, the geographical area where the China Shipping project is located. But the China Shipping project did not arise until after the 1997 EIR had been completed. Thus, it could not have qualified as one of the series of actions contemplated when the 1997 EIR was prepared. Additionally, an environmental assessment was first requested for the China Shipping project on February 26, 2001, five months after the 2000 SEIS/SEIR was finalized by the USACE. There is no evidence that any site-specific environmental issues related to the China Shipping project were addressed in either the 1997 EIR or the 2000 SEIS/SEIR.

Subdivision (c) of Guideline 15168 requires subsequent activities to be examined "in the light of the program EIR to determine whether an additional environmental document must be prepared. [¶] (1) *If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration.* [¶] (2) If the agency finds that . . . no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required." (Italics added.) The fact that the port and China Shipping entered into a side letter agreement addressing site-specific environmental concerns arising from this Project provides adequate support for appellants' argument that the port was required to prepare an initial study leading to either preparation of an EIR or a negative declaration for this Project. This was not done.

A program EIR does not always suffice for a later project. Sometimes a "tiered" EIR is required (§ 21094), sometimes a "subsequent or supplemental" EIR is required (§ 21166), and sometimes a "supplement" to an EIR is required. (§ 21166; Guidelines, §§ 15162, 15163.)

As pertinent, section 21166 provides: "no subsequent or supplemental environmental impact report shall be required by the lead agency . . . , unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

The Guidelines contemplate a "subsequent" EIR for an already existing project that is approved in an EIR and that later experiences "substantial changes" either in the project or in the circumstances in which the project will be undertaken. (Guidelines, § 15162.)

A "supplement" to an EIR is used instead of a "subsequent" EIR if a subsequent EIR is necessary and "[o]nly minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation." (Guidelines, § 15163, subd. (a)(2).) "The supplement to

the EIR need contain only the information necessary to make the previous EIR adequate for the project as revised." (Guidelines, § 15163, subd. (b).) Given the additional scope of the China Shipping project and the concerns addressed in the side letter agreement, we cannot conclude that only minor additions or changes are necessary to the 1997 EIR.

Section 21094 addresses the preparation of a "tiered environmental impact report" for a "later project" which arises after "a prior environmental impact report has been prepared and certified for a *program*, plan, policy, or ordinance." (Italics added.) Such a report is required if the lead agency determines that the later project "(1) is consistent with the program . . . for which an environmental impact report has been prepared and certified, (2) is consistent with applicable local land use plans and zoning . . . , and (3) is not subject to Section 21166." (§ 21094, subd. (b).)

There is no evidence that the lead agency formally addressed whether or not the China Shipping project fell within the concept of a "tiered" EIR. We have no doubt that the Project is a "later project" as the term is used in section 21094. Also, in its environmental assessment of February 26, 2001, the LAHD determined that the China Shipping project was compatible with the WBTIP assessed in the 1997 EIR, thus answering items 1 and 2 in the affirmative. Thus, the question remains whether or not the China Shipping project is subject to section 21166. The answer to this question is problematical because of the strategy adopted by the City in opposition to appellants' arguments.

The written decision of the trial court establishes that the position taken by the City was that the trial court should review the matter as if section 21166 were applicable. The decision states that the port conceded that an EIR was required for phases II and III of the Project. The court agreed with the City that it should apply section 21166, that phase I of the Project fell within the 1997 EIR, and, based on the concession, concluded it need not address issues relating to phases II and III. In August, we conducted a hearing on a petition for writ of supersedeas brought by appellants for stay of the entire China Shipping project pending our review. At that time, counsel for the City left us with the impression that the City's concession stood and that we needed only to address supersedeas with regard to phase I. At oral argument on the appeal, counsel for the City categorically denied that any concession had been made either to the trial court or to us. Instead, he took the position that

the 1997 EIR covered phase I and that the 2000 SEIS/SEIR sufficiently addressed phases II and III.[7]

It really does not matter which argument we credit; neither carries the day for the City. As previously noted, we conclude neither the 1997 EIR nor the 2002 SEIS/SEIR adequately addresses the site-specific environmental concerns expressed in the side letter agreement. Additionally, both scenarios raised by the City result in an improper segmentation of environmental review.

 The China Shipping project is a site-specific project to be carried out over three phases. When a specific project contemplates future expansion, the lead agency is required to review all phases of the project before it is undertaken. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396 [253 Cal.Rptr. 426, 764 P.2d 278].) The reason for this is explained in *Laurel Heights*: "A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding *whether* to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved. If post-approval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support the action already taken. We have expressly condemned this use of EIR's. (*No Oil*[*, Inc. v. City of Los Angeles* (1974)] 13 Cal.3d [68,] 79 [118 Cal.Rptr. 34, 529 P.2d 66].)" (*Laurel Heights, supra,* 47 Cal.3d at p. 394, italics in original.)

 If we accept the City's argument made to the trial court, that phase I of the Project falls within the 1997 EIR, and its concession that a new EIR is being prepared with regard to phases II and III, this is improper segmentation. If we accept the argument made before us that phase I is covered under the 1997 EIR and phases II and III are covered under the 2000 SEIS/SEIR, this is also improper segmentation.

In any event, we cannot conclude that section 21166 applies. The China Shipping project arose more than three years after the 1997 EIR and was not

[7]He did concede that the City was cooperating with other agencies in preparation of an EIR for phases II and III, but urged that it was not required under law to do so. Whether such a concession was made is problematical at best. At worst, it casts significant doubt on the integrity of the arguments proffered by the City. We could view this reversal of position as significantly undermining the trial court's conclusion that the issues relating to phases II and III were moot or premature and remand the matter for further proceedings. But to do so would only unnecessarily prolong the suspense all parties are currently experiencing over the Project.

specifically addressed in the 2000 SEIS/SEIR. It cannot be considered part of the overall "project" addressed in those documents. We conclude that the most appropriate way to address the China Shipping project is by preparation of a "tiered" EIR addressing all three phases of the Project.

"Tiering" refers "to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately *site-specific* EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared. Tiering is appropriate when the sequence of EIRS is: [¶] (a) From a general plan, policy, or program EIR to a . . . site-specific EIR." (Guidelines, § 15385, italics added.)

The Legislature encourages tiering of EIR's where applicable. "(a) The Legislature finds and declares that tiering of environmental impact reports will promote construction of needed housing and other development projects by (1) streamlining regulatory procedures, (2) avoiding repetitive discussions of the same issues in successive environmental impact reports, and (3) ensuring that environmental impact reports prepared for later projects which are consistent with a previously approved policy, plan, program, or ordinance concentrate upon environmental effects which may be mitigated or avoided in connection with the decision on each later project. The Legislature further finds and declares that tiering is appropriate when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports. [¶] (b) To achieve this purpose, environmental impact reports shall be tiered whenever feasible, as determined by the lead agency." (§ 21093.)

Appellants also contend that the China Shipping project violates the City of Los Angeles General Plan as well as the central policy of the port, and the San Pedro and Wilmington-Harbor city plans. Each of these plans and the policy of the port declares that development is to be consistent with minimizing environmental impacts. Because the port has failed to proceed in accordance with CEQA, it cannot be ascertained whether the China Shipping project violates the plans and the policy of the port.

DISPOSITION

The judgment of the trial court is reversed. The matter is remanded to the trial court with directions that it grant the petition for writ of mandate and

order the port to prepare an EIR in connection with all three phases of the China Shipping project and to issue an injunction incorporating the terms of our stay issued October 23, 2002, until further order from a court of competent jurisdiction. Costs on appeal are awarded to appellants.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied November 18, 2002, and respondents' petition for review by the Supreme Court was denied December 18, 2002.