Filed 10/29/14  Certified for publication 11/24/14 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SIERRA CLUB, | D064243 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2012-00101054-CU-TT-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy Taylor, Judge.  Affirmed.

Thomas E. Montgomery, County Counsel, and C. Ellen Pilsecker, Chief Deputy County Counsel, for Defendant and Appellant.

Law Office of Malinda R. Dickenson, Malinda R. Dickenson; Chatten-Brown & Carstens, Douglas P. Carstens and Josh Chatten-Brown for Plaintiff and Respondent.

This action arises out of the County of San Diego's (County's) 2011 general plan update, wherein the County issued a program environmental impact report (PEIR), and adopted various related mitigation measures.  In this action the Sierra Club sought, in a

petition for writ of mandate, to enforce one mitigation measure adopted by the County: the Climate Change Mitigation Measure CC-1.2 (Mitigation Measure CC-1.2). With Mitigation Measure CC-1.2, the County committed to preparing a climate change action plan with "more detailed greenhouse gas [GHG] emissions reduction [GHG] targets and deadlines" and "comprehensive and enforceable GHG emissions reductions measures that will achieve" specified quantities of GHG reductions by the year 2020.

However, the Sierra Club alleged that instead of preparing a climate change action plan that included comprehensive and enforceable GHG emission reduction measures that would achieve GHG reductions by 2020, the County prepared a climate action plan (CAP) as a plan-level document that expressly "does not ensure reductions." The County also developed associated guidelines for determining significance (Thresholds). According to the Sierra Club, review of the CAP and Thresholds project under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) was performed after the fact, using an addendum to the general plan update PEIR, without public review, without addressing the concept of tiering, without addressing the County's failure to comply with the express language of Mitigation Measure CC-1.2, and without a meaningful analysis of the environmental impacts of the CAP and Thresholds project.

The court granted the petition, concluding that the County's CAP did not comply with the requirements of Mitigation Measure CC-1.2 and thus violated CEQA. The court found that the CAP did not contain enforceable GHG reduction measures that would achieve the specified emissions reductions.

2

The County appeals, asserting (1) the statute of limitations bars the claim that the mitigation measures are not enforceable; (2) the CAP met the requirements of Mitigation Measure CC-1.2; and (3) that the trial court erred in finding that a supplemental EIR was required. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Executive Order S-3-05*

In 2005 then-California Governor Arnold Schwarzenegger issued Executive Order No. S-3-05,[1] which acknowledged California's vulnerability to the effects of climate change and established targets for reducing GHG emissions in California over time. Specifically, Executive Order No. S-3-05 set statewide targets for three points in time: 2010, 2020, and 2050. The target for 2010 (2010 Target) was to reduce emissions to the levels they were at in the year 2000. The target for 2020 is to reduce emissions to the levels they were at in 1990 (2020 Target). The target for 2050 is that emissions be 80 percent below the levels they were at in 1990 (2050 Target).

Executive Order No. S-3-05 was based on then-available climate science and represented California's share of worldwide GHG reductions necessary to stabilize climate. As the Attorney General explained, "Executive Order [No.] S-3-05 is an official policy of the State of California, established by gubernatorial order in 2005, and designed to meet the environmental objective that is relevant under CEQA (climate stabilization)."

---

[1]    On March 24, 2014, the County requested that we take judicial notice of Executive Order No. S-3-05. We grant that request.

B. *The Legislature Addresses the Need for GHG Emission Reductions*

In response to Executive Order No. S-3-05, the California Legislature enacted the California Global Warming Solutions Action of 2006, Assembly Bill No. 32. (Health & Saf. Code, § 38500 et seq.) Consistent with Executive Order No. S-3-05, Assembly Bill No. 32 required the California State Air Resources Board (CARB) to determine 1990 levels of GHG emissions and then to establish "a statewide greenhouse gas emissions limit that is equivalent to that level, to be achieved by 2020." (Health & Saf. Code, § 38550.) Assembly Bill No. 32 also stated that GHG reductions must continue after 2020, requiring that the statewide greenhouse gas emissions limit established by CARB "remain in effect unless otherwise amended or repealed" (Health & Saf. Code, § 38551, subd. (a)) and further that "[i]t is the intent of the Legislature that the statewide greenhouse gas emissions limit continue in existence and be used to maintain and continue reductions in emissions of greenhouse gases beyond 2020." (Health & Saf. Code, § 38551, subd. (b).) Assembly Bill No. 32 also required that CARB "prepare and approve a scoping plan [for] achieving the maximum technologically feasible and cost-effective reductions in greenhouse gas emissions by 2020." (Health & Saf. Code, § 38561, subd. (a).)

In December 2008 CARB approved the scoping plan. The scoping plan "identifies California's cities and counties as 'essential partners' within the overall statewide effort, and recommends that local governments set a GHG reduction target of 15% below 2005-2008 levels by 2020." Thus, it was acknowledged that CARB would accept this target as a substitute for the 1990 level referenced in Assembly Bill No. 32 and Executive Order No. S-3-05.

4

C. *The County's General Plan Update PEIR*

The County acknowledged in the general plan update PEIR that it needed to "reduce GHG emissions to 1990 levels by 2020" and that changes were required both in the community and in the County's operations, buildings, vehicle fleet, and with respect to its employee commutes, water, and waste.

A GHG emissions inventory was prepared as a special appendix (Appendix K). Appendix K set forth projected emissions reductions and assumptions then-available, and promised that the "Greenhouse Gas Reduction/Climate Action Plan, which will be prepared as an implementation strategy, will further detail the County's GHG emissions and how those reductions will occur."

There was extensive public comment on the general plan update, including from the California Attorney General:

> "[W]e encourage the County to (l) commit in the General Plan to adopt by a date certain a CAP with defined attributes (targets, enforceable measures to meet those targets, monitoring and reporting, and mechanisms to revise the CAP as necessary) that will be integrated into the General Plan; (2) incorporate into the General Plan interim policies to ensure that any projects considered before completion of the CAP will not undermine the objectives of the CAP; and (3) for all GHG impacts the County has designated as significant, adopt feasible mitigation measures that can be identified today and that do not require further analysis."  (Fn. omitted.)

D. *Mitigation Measures*

The County thereafter promised to take a series of additional actions.  These promises took the form of a group of climate change-related mitigation measures: Mitigation Measures CC-1.1 through CC-l.19 (the Mitigation Measures).  The Mitigation

5

Measures included requirements to update, review, and implement County programs; implement a strategic energy plan; revise the zoning ordinance; coordinate with other entities; educate the public; reduce vehicle miles traveled and encourage alternative modes of transportation; and, based thereon, to revise the County guidelines for determining significance.

The County made the following finding with regard to Mitigation Measure CC-1.2:

> "[Mitigation Measure] CC-l.2 requires the preparation of a County Climate Change Action Plan within six months from the adoption date of the General Plan Update.  The Climate Change Action Plan will include a baseline inventory of greenhouse gas emissions from all sources and *more detailed greenhouse gas emissions reduction targets and deadlines*.  The County Climate Change Action Plan *will achieve comprehensive and enforceable GHG emissions reduction* of 17% (totaling 23,572 MTC02E) from County operations from 2006 by 2020 and 9% reduction (totaling 479,717 MTC02E) in community emissions from 2006 by 2020.  Implementation of this Climate Change Action Plan will contribute to meeting the [Assembly Bill No.] 32 goals, in addition to the State regulatory requirements noted above."  (Italics added.)

Mitigation Measure CC-l.2 formed the basis for Mitigation Measure CC-l.8, which required "revision of the County Guidelines for Determining Significance based on the Climate Change Action Plan."

Mitigation Measure CC-1.8, in turn, formed the basis for Mitigation Measure CC-1.7, which required that the County guidelines for determining significance anticipated by Mitigation Measure CC-1.8 incorporate CARB's recommendation for a threshold for determining significance of impacts on climate change.  Should the recommendation "not be released in a timely manner," the County would "prepare its own threshold."

6

As required by CEQA (Pub. Res. Code, § 21081.6), the County incorporated a mitigation monitoring and reporting program (MMRP) into the general plan update PEIR.

Included in the MMRP was a promise to achieve GHG reductions by 2020 through comprehensive and enforceable GHG emission reduction measures. In addition to committing to the 2020 Target, the County also committed to compliance with the Executive Order No. S-3-05 trajectory. The County found "significant impacts associated with substantial climate-related risks" such as those "on water supply, wildfires, energy needs, and impacts to public health" would occur as a result of its general plan update. However, as a result of its commitment to adopt a CAP and Thresholds, and other mitigation measures, the County was able to make a finding that the climate change impacts anticipated by the general plan update PEIR would be avoided or substantially lessened.

E. *The CAP and Thresholds Project*

According to the County, the CAP was prepared for the following purposes:

1. To mitigate the impacts of climate change by achieving meaningful greenhouse gas (GHG) reductions within the County, consistent with Assembly Bill No. 32, the governor's Executive Order S-3-05, and CEQA guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. [CEQA Guidelines]).

2. To allow lead agencies to adopt a plan or program that addresses the cumulative impacts of a project.

3. To provide a mechanism that subsequent projects may use as a means to address GHG impacts under CEQA.

7

4.  To comply with the 2011 adopted County General Plan Environmental Impact Report (EIR) Mitigation Measure CC-1.2, Preparation of a Climate Action Plan.

Although compliance with Mitigation Measure CC-1.2 was one purpose of the CAP, two of the four purposes relate to preparation of the CAP as a plan-level document so that environmental review could be avoided on future projects that were determined to be below specified "thresholds." (CEQA Guidelines, § 15183.5.) However, the CAP did not mitigate climate change impacts consistent with Assembly Bill No. 32 and Executive Order No. S-3-05, did not satisfy the plan-level requirements of CEQA Guideline 15183.5, and it did not meet the requirements of Mitigation Measure CC-1.2

Instead, the CAP expressly acknowledged the possibility that "communitywide inventories will indicate that the community is not achieving its reduction targets" and admitted that the CAP "does not ensure reductions."  Further, the CAP did not include a meaningful analysis of "measures that extend beyond the year 2020."  Rather, the County documented that instead of continuing to reduce GHG emissions after 2020, GHG emissions allowed as a result of the general plan update were anticipated to *increase* after 2020.

The CAP and Thresholds were presented to the planning commission and the board of supervisors as "the project."  The Thresholds, like the CAP, purport to expressly facilitate post-2020 development that would have significant adverse climate change impacts, without any consideration of post-2020 climate science as required by Assembly Bill No. 32 and Executive Order No. S-3-05.

8

F. *The Comment Period*

The Sierra Club submitted extensive comments to the County. In particular, the Sierra Club commented on the need to take action consistent with climate science and achieve the Assembly Bill No. 32 and Executive Order No. S-3-05 GHG emissions reductions targets. The Sierra Club also provided specific examples of feasible GHG Reduction measures that would actually reduce GHG emissions and could be adopted without delay. The Sierra Club submitted additional comments and testified at the planning commission hearing, attempted to appeal the planning commission's decision, and testified at the board of supervisors hearing.

G. *Proceedings Before the Planning Commission*

The final agenda for the April 27, 2012 regular meeting of the County Planning Commission Regulation Meeting made no reference to the associated Thresholds, which were also presented to the planning commission. Despite acknowledging the significant climate change effects as well as the requirements of Assembly Bill No. 32 and Executive Order No. S-3-05, staff took the position that no additional environmental review was required. The planning commission voted to adopt staff's recommendation with one addition relating to installation of electric vehicle recharging stations.

H. *Proceedings Before the Board of Supervisors*

The Project was placed on the agenda for the June 20, 2012 board of supervisors meeting as "County of San Diego Climate Action Plan (District: All)." The staff report and supporting documents presented to the board of supervisors included (1) the CAP, (2) the Thresholds, (3) the environmental documentation , and (4) public documentation.

The environmental documentation included a memorandum referencing "CEQA Guidelines Section 15164 Addendum to the County of San Diego General Plan Update [PEIR] (SCH 2002111067)" (Addendum) which was dated the same day as the hearing, June 20, 2012. The addendum defined the project as "the CAP and Significance Guidelines." The addendum included attachments entitled "Environmental Review Update Checklist Form" (environmental checklist) and "Environmental Review Update Checklist for County of San Diego Climate Action Plan." The environmental checklist included a determination by staff that the "new information included in the CAP and Significance Guidelines represent minor technical additions to the previously certified EIR."

At the board of supervisors hearing, staff acknowledged that "[s]tate and local measures in the climate plan are insufficient to achieve our target in 2035" and explained that the CAP measures were not required, but rather that staff "believe[d]" that "education and incentives" might produce a result.

The County also documented that GHG emissions were anticipated to *increase*, not decrease, after 2020. Staff explained that the County would not comply with Executive Order No. S-3-05 because "the State's plan right now goes out to 2020." Staff further explained to the Board of Supervisors that the Thresholds would result in a less than significant finding for greenhouse gas emissions for future development projects.

Ultimately, the board of supervisors took the following actions:

    1. Adopted environmental findings including in attachment C.

10

2. Adopted the plan titled "County of San Diego Climate Action Plan (Attachment A)."

The only findings made by the County were the following:

1. The environmental impact report (EIR) dated August 3, 2011 on file with the Department of Planning and Land Use (DPLU) as Environmental Review Number SCH 2002111067 was completed in compliance CEQA and the State and County CEQA Guidelines and that the Board of Supervisors has reviewed and considered the information contained therein and the Addendum thereto dated June 20, 2012 on file with DPLU and attached thereto; and

2. There were no changes in the project or in the circumstances under which the project was undertaken that involved significant new environmental impacts which were not considered in the previously certified EIR dated August 3, 2011, that there was no substantial increase in the severity of previously identified significant effects, and that no information of substantial importance had become available since the EIR was certified as explained in the environmental checklist dated June 20, 2012 and attached thereto.

I. *The Sierra Club Files Suit*

The Sierra Club filed a petition for writ of mandate, challenging the June 20, 2012 approval of the CAP and Thresholds project, including the associated environmental review. The Sierra Club alleged that the CAP did not meet the requirements of Mitigation Measure CC-1.2, the Thresholds were not adopted pursuant to the requirements of CEQA Guideline section 15064.7, and that an EIR should have been prepared.

J. *The Trial Court's Decision*

The trial court determined that the CAP did not comply with the requirements for a CAP as set forth in Mitigation Measure CC-l.2, and thus violated CEQA. The trial court found that the CAP neither contained enforceable GHG reduction measures that

11

will achieve the specified emissions reductions, nor detailed deadlines for GHG emission reductions.

The trial court further found that the approval process violated CEQA, noting: "There is no showing that the County properly considered whether the CAP is within the scope of the PEIR" and that "environmental review is necessary to ascertain whether the CAP met the necessary GHG emission reductions when considering the CAP is merely hortatory and contains no enforcement mechanism for reducing GHG emissions."

Further, the trial court determined that whether or not the Thresholds were adopted was a subsidiary issue that did not need to be reached in light of the trial court's decision on the CAP (which formed the basis for the Thresholds) and the process by which it was approved.

## DISCUSSION

### I. *STANDARD OF REVIEW*

The Sierra Club and the County agree as to the applicable standards of review.

In reviewing the County's actions under CEQA, we must determine whether there was "a prejudicial abuse of discretion." (Pub. Resources Code, § 21168.5.) "'Abuse of discretion is established if the agency has not proceeded in a manner required by law, or if the determination or decision is not supported by substantial evidence.'" (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 486.)

"[A] reviewing court must adjust its scrutiny to the nature of the alleged defect." (*Vineyard Area Citizens for Responsible Growth, Inc.* v. *City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).) Challenges to an agency's failure to proceed in the

manner required by CEQA are subject to a significantly different standard of review than challenges that an agency's decision is not supported by substantial evidence. (*Ibid.*) Where the challenge is that the agency did not proceed in the manner required by law, a court must "determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements.'" (*Ibid.*)

Furthermore, when a prior environmental impact report has been prepared and certified for a program or plan, the question for a court reviewing an agency's decision not to use a tiered EIR for a later project "is one of law, i.e., 'the sufficiency of the evidence to support a fair argument.'" (*Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1318.) "[I]f there is substantial evidence in the record that the later project may arguably have a significant adverse effect on the environment which was not examined in the prior program EIR, doubts must be resolved in favor of environmental review and the agency must prepare a new tiered EIR, notwithstanding the existence of contrary evidence." (*Id.* at p. 1319, fn. omitted.) The court "must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeded as required by law." (*Id.* at 1317.)

## II. *OVERVIEW OF CEQA*

"The fundamental goals of environmental review under CEQA are information, participation, mitigation, and accountability." (*Lincoln Place Tenants Assn.* v. *City of Los Angeles* (2007) 155 Cal.App.4th 425, 443-444 (*Lincoln Place II*).) As the California Supreme Court has explained: "If CEQA is scrupulously followed, the public will know

13

the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of the University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).)

CEQA requires a public agency to prepare an environmental impact report (EIR) before approving a project that may have significant environmental effects. (Pub. Resources Code, § 21100.) The EIR is "'the heart of CEQA' . . . an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.'" (*Laurel Heights, supra,* 47 Cal.3d at p. 392.)

CEQA authorizes the preparation of various kinds of environmental impact reports depending upon the situation, such as the subsequent EIR, a supplemental EIR, and a tiered EIR. (Pub. Resources Code, §§ 21166, 21068.5, 21093, 21094.) Whereas the subsequent EIR and supplemental EIR are used to analyze modifications to a particular project, a tiered EIR is used to analyze the impacts of a later project that is consistent with an EIR prepared for a general plan, policy, or program. (CEQA Guidelines, § 15385; compare Pub. Resources Code, § 21166 & CEQA Guidelines §§ 15162, 15163 & 15164 [referencing "the project"] with Pub. Resources Code, § 21093 [stating that later projects may use tiering].)

CEQA requires that "environmental impact reports shall be tiered whenever feasible." (Pub. Resources Code, § 21093, subd. (b).) Tiering means "the coverage of

14

general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared."  (CEQA Guidelines, § 15385; Pub. Resources Code, § 21068.5.)  In the context of program and plan-level EIR's, the use of tiered EIR's is mandatory for a later project that meets the requirements of Public Resources Code section 21094, subdivision (b).  (Pub. Resources Code, § 21094, subd. (a).)

Another requirement of CEQA is that public agencies "should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects."  (Pub. Resources Code, § 21002.)  "A 'mitigation measure' is a suggestion or change that would reduce or minimize significant adverse impacts on the environment caused by the project as proposed."  (*Lincoln Place II, supra,* 155 Cal.App.4th at p. 445.)

If the agency finds that mitigation measures have been incorporated into the project to mitigate or avoid a project's significant effects, a "public agency shall adopt a reporting or monitoring program for the changes made to the project or conditions of project approval, adopted in order to mitigate or avoid significant effects on the environment.  The reporting or monitoring program shall be designed to ensure compliance during project implementation."  (Pub. Resources Code, § 21081.6, subd. (a)(1).)

If a mitigation measure later becomes "impracticable or unworkable," the "governing body must state a legitimate reason for deleting an earlier adopted mitigation

15

measure, and must support that statement of reason with substantial evidence." (*Lincoln Place Tenants Association v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1509 (*Lincoln Place I*).)

## III. *ANALYSIS*

### A. *Statute of Limitations Defense*

The County asserts that the Sierra Club's claim that the mitigation measures it adopted are not enforceable is barred by the statute of limitations because the Sierra Club should have challenged the County's approval of the general plan update EIR, not the CAP. We reject this contention.

The petition was filed 30 days after the County's June 20, 2012 approval of the CAP. In addition, the lawsuit was filed 29 days after the County filed a notice of determination (NOD). The Sierra Club's July 20, 2012 petition was timely filed 29 days after. Thus, the County triggered the 30-day statute of limitations set forth in Public Resources Code section 21167, subdivisions (b) and (e).

The Sierra Club is not challenging the validity of the general plan update PEIR or the enforceability of the mitigation measures provided in that document. Rather, the Sierra Club is challenging the project before the Board of Supervisors on June 20, 2012, and seeks to enforce a key mitigation measure set forth in the EIR and MMRP - Mitigation Measure CC-1.2.

Further, the Court of Appeal in *Lincoln Place II, supra,* 155 Cal.App.4th 425 rejected a similar argument to that made by the County. In that case, a tenants' association sought to compel the City of Los Angeles to enforce mitigation measures

16

contained in a vesting tentative tract map issued by the city. The city argued that the 180-day statute of limitations contained in Public Resources Code section 21167 for challenges to approval of projects without determining whether they have a significant effect on the environment barred the plaintiffs' action. In rejecting that action, the Court of Appeal held "[t]he statute's plain language demonstrates it has no application to this case seeking to *enforce mitigating conditions.*" (*Lincoln Place II,* at p. 453, fn. 23, italics added.)

Moreover, the cases cited by the County in support of its position are inapposite. The County cites *River Valley Preservation Project* v. *Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154 and *Friends of Davis* v. *City of Davis* (2000) 83 Cal.App.4th 1004 for the proposition that because the time period within which to challenge the general plan update EIR has expired, the EIR is conclusively presumed to have complied with CEQA. Here, however, the Sierra Club is not challenging the general plan update EIR, but the CAP and Thresholds project, and is seeking to enforce Mitigation Measure CC-1.2.

The County's reliance upon *Environmental Council of Sacramento* v. *City of Sacramento* (2006) 142 Cal.App.4th 1018 and *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184 is also unavailing. The petitioners in those actions were challenging the adequacy of the mitigation measures themselves. Here, the Sierra Club does not attack the adequacy of the mitigation measure in the general plan update PEIR. To the contrary, the Sierra Club's lawsuit is in *support* of the County's past findings and promises to achieve GHG Reductions.

17

B. *Failure To Proceed in a Manner Required by Law*

As detailed, *ante*, implementation of Mitigation Measure CC-l.2 was only one of the purported purposes of the CAP and Thresholds project. The CAP and Thresholds project also purports to be a plan-level document for use in review of later projects.

As we shall explain, *post*, with respect to the CAP as mitigation for a plan-level document, the County failed to proceed in the manner required by CEQA by proceeding with the CAP and Thresholds project in spite of the express language of Mitigation Measure CC-l.2 that the CAP "include . . . more detailed greenhouse gas emissions reduction targets and deadlines" and that the CAP "will achieve comprehensive and enforceable GHG emissions reduction" by 2020. With respect to the CAP as a plan-level document itself, the County failed to proceed in the manner required by law by failing to incorporate mitigation measures into the CAP as required by Public Resources Code section 21081.6.

1. *The County failed to adopt a CAP that complied with the requirements of Mitigation Measure CC-1.2*

"Mitigating conditions are not mere expressions of hope." (*Lincoln Place I, supra,* 130 Cal.App.4th at p. 1508.) Once incorporated, mitigation measures cannot be defeated by ignoring them or by "attempting to render them meaningless by moving ahead with the project in spite of them." (*Lincoln Place II, supra,* 155 Cal.App.4th at p. 450.) This is true even where subsequent approvals are ministerial. (*Katzeff v.California Department of Forestry & Fire Protection* (2010) 181 Cal.App.4th 601, 614 [public agency "may not authorize destruction or cancellation of the mitigation—whether or not

18

the approval is ministerial—without reviewing the continuing need for the mitigation, stating a reason for its actions, and supporting it with substantial evidence"].)  If a mitigation measure later becomes "impractical or unworkable," the "governing body must state a legitimate reason for deleting an earlier adopted mitigation measure, and must support that statement of reason with substantial evidence."  (*Lincoln Place I, supra,* 130 Cal.App.4th at p. 1509.)

a.  *The CAP does not include enforceable GHG emissions required by Mitigation Measure CC-1.2*

When it adopted the general plan PEIR, the County promised to achieve specified GHG reductions by 2020.  However, when it approved the CAP and Thresholds project, the County stated that the CAP does not ensure the required GHG emissions reductions.  Rather, the County described the strategies as recommendations.

Until this litigation was initiated, the County described the CAP as the most critical component of the County's climate change mitigation efforts.  The CAP was intended to "'provide[] the specific details associated with [the General Plan] strategies and measures for greenhouse gas (GHG) emissions reduction *that were not available during the program-level analysis of the General Plan.'"  (Italics added.)

The County agreed to the mitigating requirement of a CAP containing "comprehensive and enforceable GHG emissions reduction measures that will achieve" the specified GHG Reductions by 2020.   This is because, as the County acknowledges, Executive Order No. S-3-05 requires consistent emissions reductions each year from

19

2010 through 2020 and then a greater quantity of emissions reductions each year from 2020 through 2050.

The County asserts that "[f]ive of the reduction measures incorporated into the CAP are also embodied in state or federal law" and that "CEQA permits reliance on existing regulatory standards as mitigation when it is reasonable to believe compliance will occur."

However, the County acknowledges that these measures will not, alone, achieve the specified GHG emissions reductions by 2020. In fact, the record shows that without local measures the requirements of Assembly Bill No. 32 will not be met.

Further, the record demonstrates that many of the mitigation measures set forth in the MMRP are not likely to achieve GHG emissions reductions by 2020 as promised by Mitigation Measure CC-1.2 because they are not currently funded. The record show that the County has not funded essential programs like replacing its own vehicle fleet, implementing water conservation programs, preparing town center plans, and reducing water demand. The County cannot rely on unfunded programs to support the required GHG emissions reductions by 2020, as Mitigation Measure CC-1.2 requires.

Transportation is a major concern, which the County concedes is the largest source of community GHG emissions. The Sierra Club presented evidence below that driving reductions needed to achieve Assembly Bill No. 32 and Executive Order No. S-3-05 targets are not met. The County did not dispute this evidence. The record shows that transit-related measures are either unfunded, that the County is not making meaningful

20

implementation efforts, and in some instances that the County is acting contrary to mitigation measures incorporated into the general plan update PEIR.

For example, two of the four transportation measures, T1 (increase transit sse) and T2 (increase walking & biking), rely on at least one unfunded program. In addition, measures T1 and T2, as well as T3 (increase ridesharing), also rely on "coordination" with SANDAG and/or other entities.

In response to Sierra Club's comments relating to the effectiveness of these measures as a result of current SANDAG (San Diego Association of Governments) priorities, the County did not request funds based on the fact that it does not control how SANDAG spends its money. As the County stated, "The County does not control regional plans or allocation of regional transportation funding." This position was rejected by the Supreme Court in *City of Marina v. Board of Trustees of the California State University* (2006) 39 Ca1.4th 341, 367 [holding respondent could not disclaim responsibility for making payments without first asking for funds].

The CAP's transportation section also does not include an analysis of the County's own operations, and the record appears to include contradictions even over programs over which the County has exclusive control, such as replacement of its own vehicle fleet with alternatively fueled vehicles. Although the County suggests it will implement "1 % greater efficiency per year", the County has not formally bound itself do so. Indeed, there is no mention of potential funding sources with respect to reductions related to County operations.

21

b. *The CAP contains no detailed deadlines for reducing GHG emissions*

As the trial court found, the CAP contained no detailed deadlines. The County argues on appeal that the 2020 goal and the timeframes set forth in the MMRP are sufficient to meet the requirement of "more detailed . . . deadlines." However, Mitigation Measure CC-1.2 expressly required that the CAP provide more detailed deadlines. If the County did not intend for the CAP to do anything further with respect to deadlines than already set forth, the County would not have used the word "more." Indeed, in addition to not providing the promised deadlines, the CAP acknowledges that it will not be effective unless it is updated.

c. *The evidence cited by the County*

The County asserts that CAP measures will be effective because "[p]articipation rates were discussed and modified," and the "feasibility of attaining reduction targets was assessed." However, the County does not cite any evidence in the record to support its belief that people will participate in the various programs to the extent necessary to achieve the reductions asserted, or even assert that feasible measures will actually be implemented.

Rather, the County cites to entire appendices and chapters of the CAP. However, information contained in appendices are "'not a substitute for "a good faith reasoned analysis."'" (*Vineyard, supra,* 40 Cal.4th at p. 442.) "The audience to whom an EIR must communicate is not the reviewing court but the public and the government officials deciding on the project." (*Id.* at p. 443.)

22

The County also asserts that the CAP "demonstrates a [GHG emissions] reduction of 19%." However, the CAP expressly states that it does not ensure reductions. Instead, the County's evidence relates to quantification of the respective measures. Quantifying GHG reduction measures is not synonymous with implementing them. Whether a measure is effective requires more than quantification, but an assessment of the likelihood of implementation. There is no evidence in the record that the above-referenced mitigation measures will make any contribution to achieving GHG emissions reductions by 2020.

2. *The County's failure to make findings regarding the environmental impact of the CAP and Thresholds project*

Instead of analyzing and making findings regarding the environmental effects of the CAP and Thresholds project, the County made an erroneous assumption that the CAP and Thresholds project was the same project as the general plan update. (*Sierra Club, supra,* 6 Cal.App.4th at p. 1320 ["section 21166 and its companion section of the [CEQA] Guidelines appear to control only when the question is whether more than one EIR must be prepared for what is essentially the same project"].) As a result, the County failed to render a "written determination of environmental impact" before approving the CAP and Thresholds project. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 81; Pub. Resources Code, § 21151.) This constitutes a failure to proceed in the manner required by law. (*No Oil, supra,* 13 Cal.3d at p. 81.)

By inaccurately assuming the CAP and Thresholds project was the same project as the general plan update, the County failed to analyze the environmental impacts of the

CAP and Thresholds project itself. (*Natural Resources Defense Council, Inc.* v. *City of Los Angeles* (2002) 103 Cal.App.4th 268, 283 [holding CEQA violated where "no evidence that the [County] formally addressed whether or not the [] project fell within the concept of a 'tiered' EIR"].) As a result, the County never made the required findings that the effects of the CAP and Thresholds project were examined, mitigated, or avoided. (Pub. Resources Code, § 21094, subd. (a).)

The facts of the present case, as the trial court found, are similar to *Center for Sierra Nevada Conservation* v. *County of El Dorado* (2012) 202 Cal.App.4th 1156 (*CSNC*). In *CSNC,* the county prepared a general plan and PEIR. (*Id.* at p. 1162.) In the PEIR, one of the mitigation measures was the preparation of a management plan, including a fee program, to mitigate the general plan's impacts on oak woodland habitat. (*Id.* at p. 1163.) The initial study concluded that the project was merely an implementation of the county's general plan. (*Id.* at p. 1176.)

The Court of Appeal rejected this argument, holding that a tiered EIR was required to examine the management plan since the PEIR did not include sufficient details, rejecting the argument that the management plan was merely an implementation of the general plan. (*CSNC, supra,* 202 Cal.App.4th at pp. 1176, 1184-1185.)

The County attempts to distinguish *CSNC* by asserting the general plan update PEIR analyzed the same environmental issue addressed in the CAP. However, the record reveals that the necessary details were not available to the County at the time the general plan update PEIR was certified. Indeed, no component of the project, the CAP or the Thresholds, had even been created at the time of the general plan update.

24

As the Court of Appeal in *CSNC* explained:

> "That the preceding 2004 program EIR contemplated adverse environmental impacts resulting from development under the 2004 General Plan does not remove the need for a tiered EIR for the oak woodland management plan. . . . Here, the specific project—the oak woodland management plan (including Option B fee program)—required a tiered EIR to examine its specific mitigation measures and fee rate." (*CSNC, supra,* 202 Cal.App.4th at p. 1184.)

The general plan update anticipated implementation of mitigation measures—CC-l.2, CC-1.7, and CC-l.8—as mitigating conditions to mitigate the adverse climate change environmental impacts of the general plan update. Those measures were analyzed in the PEIR. However, the PEIR never considered the use of the CAP and the Thresholds as a plan-level program. Thus, the environmental impacts of its use needed to be considered in an EIR. (*NRDC, supra,* 103 Cal.App.4th at p. 281 [project did not arise until after PEIR and thus was not contemplated therein].)

The County contends that the Board of Supervisors made an "implied finding" that the CAP complied with Mitigation Measure CC-1.2 and that finding is "entitled to great deference." However, "such an 'implicit finding' does not satisfy CEQA's requirement of express findings." (*Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1037.) "'[T]he board of supervisors must make findings . . . to permit a reviewing court to bridge the analytic gap between the evidence and the ultimate decision.'" (*People* v. *County of Kern* (1976) 62 Cal.App.3d 761, 777; see *Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 442 ["passing references to the mitigation measures are insufficient to constitute a finding, as nothing in City's resolutions binds it to follow these measures"].)

25

Moreover, even if "implied findings" were permissible, there can be no "interpretation" of Mitigation Measure CC-1.2 contrary to its express terms. (*Southern Cal. Edison Co.* v *Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1105 ["an agency's interpretation of a regulation or statute does not control if an alternative reading is compelled by the plain language of the provision"]; see *Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042, 1062 [agency's "view of the meaning and scope of its own ordinance" does not enjoy deference when it is "'clearly erroneous or unauthorized'"].)

3. *The County failed to proceed in the manner required by law by failing to incorporate mitigation measures directly into the CAP*

As discussed, *ante*, one of the major differences between the climate change action plan anticipated by Mitigation Measure CC-1.2 in the general plan update PEIR and the CAP and Thresholds project as prepared, is that the general plan update PEIR did not analyze the CAP as a plan-level document that itself would facilitate further development. As a plan-level document, the CAP is required by CEQA to incorporate mitigation measures directly into the CAP:

> "A public agency *shall provide the measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures*. Conditions of project approval may be set forth in referenced documents which address required mitigation measures or, *in the case of the adoption of a plan*, policy, regulation, or other public project, *by incorporating the mitigation measures into the plan*, policy, regulation, or project design." (Pub. Resources Code, § 21081.6, subd. (b), italics added.)

26

As authority for the assertion that it did not need to incorporate enforceable mitigation measures into the CAP directly, the County cites *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 689-690.  However, *Twain Harte* was decided before enactment of Public Resources Code section 21081.6, subdivision (b), which, as discussed, *ante*, requires "in the case of the adoption of a plan" that mitigation measures be fully enforceable "by incorporating the mitigation measures into the plan . . . ."

"The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283.)  By failing to consider environmental impacts of the CAP and Thresholds project, the County effectively abdicated its responsibility to meaningfully consider public comments and incorporate mitigating conditions.  In addition to the example discussed, *ante*, related to transportation impacts, the Sierra Club also provided examples of mitigation implemented by other regions to mitigate the effects of climate change in the energy sector.  The County neither implemented nor responded to these examples which have already been implemented elsewhere.

4.  *The trial court's finding that the County must prepare an EIR*

As set forth in *Lincoln Place I*, a supplemental EIR must be prepared when a public agency determines a previously adopted mitigation measure is infeasible.  (*Lincoln Place I, supra,* 130 Cal.App.4th at pp. 1508-1509.)  In addition, CEQA guidelines,

27

section 15183.5, subdivision (b)(1)(F) provides that a plan for the reduction of GHG emissions should "[b]e adopted in a public process following environmental review."

The County's failure to comply with Mitigation Measure CC-1.2 and Assembly Bill No. 32 and Executive Order No. S-3-05 supports the conclusion that the CAP and Thresholds project will have significant, adverse environmental impacts that have not been previously considered, mitigated, or avoided.

a. *Substantial evidence supports the court's finding preparation of an EIR was required*

The County asserts that the substantial evidence standard of review applies to the question of whether a supplemental EIR was required, under which deference is given to an agency's determination. (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 200-202.) The Sierra Club, on the other hand asserts that the "fair argument" test applies, under which "deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary." (*Sierra Club, supra,* 6 Cal.App.4th at p. 1318.) We conclude that under either standard, the trial court did not err in finding a supplemental EIR was required.

The fair argument versus substantial evidence test is of no moment because, here, there is no substantial evidence in the record supporting the County's erroneous conclusion that "activities associated with the CAP and Significance Guidelines are within the scope of the General Plan Program EIR."

The County does not dispute that "to avoid serious climate change effects, atmospheric GHG concentrations need to be stabilized as quickly as possible." In fact, the County warns that expected local adverse effects of climate change include "higher temperatures, [¶] a greater number of extremely hot days, [¶] changes in the pattern and amount of precipitation, [¶] decreased water supplies accompanied by increased demand, [¶] increased wildfire risk, [¶] changes in ecosystems, and [¶] decline or loss of plant and animal species." However, the CAP and Thresholds project was approved without the appropriate environmental analysis to avoid or mitigate these consequences. As the trial court found, "environmental review is necessary to ascertain whether the CAP met the necessary GHG emission reductions when considering the CAP is merely hortatory and contains no enforcement mechanism for reducing GHG emissions."

Moreover, as the County acknowledges, the details of the CAP "were not available during program-level analysis of the General Plan." For example, the general plan update PEIR did not provide a "baseline GHG emissions inventory; detailed GHG-reduction targets and deadlines; comprehensive and enforceable GHG emissions-reduction measures; and implementation, monitoring, and reporting of progress toward the targets defined in the CAP." In 2011 the County found that implementation of mitigation measures, including CC-l.2, CC-1.7, and CC-l.8, were part of the mitigation imposed to mitigate the climate change impacts of the general plan update. It cannot be said that failing to comply with Mitigation Measure CC-1.2, Assembly Bill No. 32, and Executive Order No. S-3-05 does not change the environmental conclusions in the general plan update PEIR.

29

Further, the general plan update PEIR did not contemplate that preparation of the CAP and Thresholds project was at the "plan-level." As a plan-level document, the CAP and Thresholds project was required to undergo environmental review as a matter of law. (CEQA Guidelines, § 15183.5, subd. (b)(l)(F).) The general plan update PEIR also did not contemplate that as a result of the CAP, "[m]ore projects will fall below the bright line threshold, and will not have to conduct detailed analysis", much less study the environmental impact of such. County staff, the planning commission, and the board of supervisors were all aware that approving the CAP and Thresholds project would allow more projects to avoid a climate change analysis, including projects with post-2020 climate change impacts without post-2020 environmental review.

Furthermore, in 2011, the County found that climate change impacts were mitigated not only by implementation of mitigation measures, but also by "compliance with applicable regulations" including Assembly Bill No. 32 and Executive Order No. S-3-05.

By contrast, the CAP and Thresholds project now acknowledges it does not comply with Executive Order No. S-3-05. Instead of maintaining a constant rate of GHG emissions reductions after 2020, as required by Executive Order No. S-3-05, the County admits that GHG emissions will instead increase after 2020. Thus, the County's own documents demonstrate that the CAP and Thresholds project will not meet the requirements of Assembly Bill No. 32 and Executive Order No. S-3-05 and thus will have significant impacts that had not previously been addressed in the general plan update PEIR.

30

The explanation given to the board of supervisors for failing to address the post-2020 impacts facilitated by the CAP and Thresholds project was that "the State's plan doesn't go out that far, and it would be speculative for us to do that."

However, contrary to the County's argument that it would be "speculative" to consider the environmental impacts of the CAP, the County has acknowledged that other agencies have, in fact, been able to do so.  It is an abuse of discretion to reject alternatives or mitigation measures that would reduce adverse impacts without supporting substantial evidence.  (CEQA Guidelines, §§ 15043, 15093, subd. (b).)  The County's assumption that considering post-2020 impacts is "speculative" is not supported by substantial evidence.  (Pub. Resources Code, § 21082.2, subd. (c) ["Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous . . . is not substantial evidence.  Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts."].)

The Sierra Club provided feasible mitigation measures.  The County rejected these mitigation measures without substantial evidence for doing so.

In sum, the CAP does not fulfill the County's commitment under CEQA and Mitigation Measure CC-1.2, to provide detailed deadlines and enforceable measures to ensure GHGF emissions will be reduced.

DISPOSITION

The judgment is affirmed.  The Sierra Club shall recover its costs on appeal.


NARES, J.

I CONCUR:


McCONNELL, P. J.


I CONCUR IN THE RESULT:


HUFFMAN, J.

Filed 11/24/14

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE


SIERRA CLUB,

Plaintiff and Respondent,

v.                                                          D064243

COUNTY OF SAN DIEGO,                      (Super. Ct. No. 37-2012-00101054-
                                                                          CU-TT-CTL)
Defendant and Appellant.



THE COURT:

      The opinion in this case filed October 29, 2014 was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), requests by Chatten-Brown & Carstens and Mogavero Notestine Associates pursuant to California Rules of Court, rule 8.1120(a) for publication are GRANTED.

      IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

      ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.



                          MCCONNELL, Presiding Justice


cc:  All Parties