Filed 12/21/21  Sierra Club v. County of San Diego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| SIERRA CLUB,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>COUNTY OF SAN DIEGO,<br><br>    Defendant and Appellant;<br><br>INTEGRAL COMMUNITIES, LLC et al.,<br><br>    Real Parties in Interest and Appellants. | D077548, D077972<br><br><br>(Super. Ct. No. 37-2018-00043084-CU-TT-CTL) |

CONSOLIDATED APPEALS from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Hecht Solberg Robinson Goldberg & Bagley, Richard A. Schulman, Beth Abramson, Sadaf Behdin; Richard A. Schulman for Real Party in Interest and Appellant RCS–Harmony Partners, LLC.

Sheppard, Mullin, Richter & Hampton, John R. Ponder, Karin Dougan Vogel, Whitney A. Hodges, and Dana Dunwoody for Real Party in Interest

and Appellants Integral Communities LLC and The Eden Hills Project Owner, LLC.

Chatten-Brown Carstens & Minteer, Amy Minteer, Josh Chatten-Brown, Michelle Black, and Sunjana Supekar for Plaintiff and Respondent Sierra Club.

In the trial court, Sierra Club challenged the County of San Diego's (County) approval of three housing developments proposed for undeveloped portions of the county. The three developments are known as Harmony Grove Village South (Harmony Grove), Valiano, and Otay 250.) A primary basis for Sierra Club's petition for writ of mandate was its assertion that the approvals were made in violation of the California Environmental Quality Act (Pub. Resources Code,[1] § 21000 et seq., CEQA) because they did not adequately mitigate the projects' expected greenhouse gas (GHG) emissions.

Sierra Club's challenge followed its successful separate litigation (with other environmental organizations) challenging the County's Climate Action Plan (CAP) under CEQA based on the County's failure to incorporate sufficient GHG mitigation measures in the Environmental Impact Report (EIR) for the CAP. That case precipitated changes to the CAP, which were again successfully challenged for continuing to provide insufficient GHG emission mitigation. The County's appeal to this court of that second challenge to the CAP was pending at the time the litigation in this case was proceeding in the trial court.

Before the hearing on the Sierra Club's petition in this case, the Otay 250 developers reached a settlement and were dismissed from the case.

---

[1]	Subsequent undesignated statutory references are to the Public Resources Code.

After the hearing, the trial court found the County's approvals of Harmony Grove and Valiano were invalid because the GHG mitigation measures in those projects' EIRs failed to satisfy CEQA and were inconsistent with the County's General Plan. The developers of Harmony Grove and Valiano, who are the real parties in interest, and the County filed notices of appeal from the order granting in part Sierra Club's petition.

Before judgment was entered, this court affirmed the trial court's decision in the earlier litigation finding the GHG mitigation measures in the EIR for the revised version of the CAP were insufficient under CEQA. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467 (*Golden Door II*).) Thereafter, final judgment in this case was entered by the trial court.

Before briefing, the County dismissed its appeal. The Harmony Grove and Valiano developers, however, continued their challenges. Harmony Grove's developer, RCS–Harmony Partners, RCS (Harmony), argues the judgment must be reversed because its GHG emission mitigation measures are consistent with our decision in *Golden Door II* and because the County's approval of those measures is supported by substantial evidence. The Valiano appeal is narrower. Its developers, Integral Communities LLC and The Eden Hills Project Owner, LLC (collectively, Integral), concede the GHG mitigation measures contained in its EIR are insufficient to satisfy CEQA. Integral contends, however, that the trial court's judgment should be reversed and remanded with directions for the court to direct the County to reinstate its approval and simply modify the GHG mitigation measures to conform with *Golden Door II*.

For the reasons discussed herein, we reject both Harmony's and Integral's appellate contentions and affirm the judgment.

3

FACTUAL AND PROCEDURAL BACKGROUND

A. *Harmony Grove Administrative Proceedings*

Harmony Grove is a proposed extension of an existing development located in the northeast part of San Diego County. The project, situated on 111 acres, is approximately two and half miles west of Interstate 15 and a little over two and half miles south of State Route 78. The proposed project consists of 453 dwelling units, both single family and multi-family residences, and 5,000 square feet of commercial and civic use space. The project also includes 75 acres of outdoor recreational space and undeveloped open space.

After preliminary meetings with the County in 2014, on March 25, 2015, Harmony submitted its initial application for approval of the project, including an amendment to the County's General Plan. The County published a draft EIR on April 20, 2017 soliciting public comment. In response to comment and the separate Sierra Club challenge to the CAP discussed in the introduction (*Superior Court in Sierra Club v. County of San Diego*, Case No. 2012-0101054/*Golden Door Properties LLC v. County of San Diego*, Case No. 2016-0037402 (April 28, 2017)), which invalidated the GHG metric used in Harmony Grove's draft EIR,[2] the document was revised and published for a second time on February 22, 2018 for public comment on the revised portions.

The revised draft EIR explained that the project had been modified to reach a threshold of net zero GHG emissions in compliance with CEQA. The document explained the revised GHG analysis was not based on the invalidated CAP, but was consistent with the revised County CAP currently pending approval because the mitigation measures proposed for the

---

[2]    The decision was affirmed by this court in *Golden Door Properties, LLC v. County of San Diego* (2018) 27 Cal.App.5th 892 (*Golden Door I*).

4

development made the project carbon neutral. Specifically, the revised draft EIR stated its "Mitigation Measures M-GHG-1 and M-GHG-2 that require the Project to purchase and retire carbon offsets in a quantity sufficient to reduce emissions effects to net zero, is in accord with the Mitigation Measure M-GHG-1 from the County's Final Supplemental EIR (SCH No. 2016101055) for its CAP." The document also set forth a list of the design features the project would incorporate to mitigate GHG emissions, and which were included as conditions of approval, such as charging infrastructure for zero emission vehicles and solar/photovoltaic systems in all residential units and energy efficiency best practices.

By way of resolution, the County's Board of Supervisors certified the revised draft EIR and the Harmony Grove project's other entitlements on July 25, 2018.

## B. Valiano Administrative Proceedings

The proposed Valiano project is located on 239 acres in an unincorporated portion of the county within the San Dieguito Community Planning area. The Valiano site is close to Harmony Grove; located approximately two and half miles west of Interstate 15 and one and a half miles south of State Route 78. The project includes 326 dwelling units and 54 accessory dwelling units in five new neighborhood configurations, which have varying densities, lot sizes, and architectural styles. The project includes 149 acres of open space, including outdoor recreational space, an agricultural easement, and undeveloped open space.

Integral applied to the County for project approval (which included amendment to the General Plan, adoption of a specific plan, and a vesting tentative map to divide the property) on February 28, 2013. The draft EIR for the project was circulated for public comment from April 30, 2015 to June

15, 2015. In response to comments and changes in decisional law related to GHG emissions, the document was modified and circulated again for public comment from December 8, 2016 to January 30, 2017.

As with the Harmony Grove project, in response to comments and Sierra Club's separate successful legal challenge to the CAP invalidating the GHG metric used in Valiano's draft EIR, the document was revised again. Unlike Harmony Grove, there was no additional public recirculation of the revised Valiano EIR and it became the final EIR for the project. The revised report explained that a supplemental analysis "was prepared to utilize the significance criteria in Appendix G of the CEQA Guidelines related to GHG emissions to evaluate the project's GHG emissions. The [s]upplement augmented the previous analysis, did not change the focus of the GHG Emissions Analysis or F[inal] EIR, or the existing Project Design Features resulting in less than significant GHG emissions, including independently committing to offsetting 100 percent of Project electrical uses through measures including on-site photovoltaic (PV; solar) panels." In addition, the final EIR explained that Integral "voluntarily committed to attaining net zero emissions; which further reduces the less than significant impacts identified" in the earlier versions of the EIR.

On May 11, 2018, the County Planning Commission recommended approval of the Valiano project after a noticed public hearing. On July 25, 2018, the County Board of Supervisors certified the EIR and approved the related project entitlements. The approval included mitigation measure M-GHG-1 to address the project's GHG emissions, both during construction and throughout the development's 30-year lifespan. The measure requires the developer to provide the County with evidence of its "one-time purchase of carbon credits sufficient to reduce the contribution of construction-related

6

GHG emissions to zero."[3]  Likewise, with respect to operational emissions, i.e. emissions occurring after the completion of construction and during the life of the development, the measure requires the developer, "prior to recordation of the first building permit," to provide evidence to the County that it "obtained carbon credits for the incremental portion of the [p]roject within the Site Plan in a quantity sufficient to offset, for a 30-year period, the operational GHG emissions from that incremental amount of development to net zero ….  The amount of carbon offsets required for each implementing Site Plan shall be based on the GHG emissions for each land use within the implementing Site Plan …."

The mitigation measure mandates that the carbon credits "be purchased through:  (i) a [California Air Resources Board (CARB)]-approved registry, such as the Climate Action Reserve, the American Carbon Registry, and the Verified Carbon Standard; (ii) through CAPCOA GHG Rx;[4] or, (iii) if no registry is in existence as identified above, then any other reputable registry or entity that issues carbon offsets consistent with Cal. Health & Safety Code section 38562[, subd.] (d)(1), to the satisfaction of the [County] Director of [Planning and Development Services (PDS)]."

*C. Present Litigation*

On August 23, 2018, Sierra Club filed a petition for writ of mandate and complaint for declaratory relief challenging the County's approval of the

---

[3]    The measure defines construction-related emissions as those generated from "grading, site preparation, building construction, architectural coatings-related emissions, and the one-time loss of carbon sequestered in existing on-site vegetation."

[4]    The California Air Pollution Control Officers Association Greenhouse Gas Reduction Exchange.

Harmony Grove, Valiano, and Otay 250 developments. The petition sought a writ of mandate ordering the County's approvals of the developments to be set aside for failing to comply with its obligations under CEQA and for improperly amending its General Plan. The petition also challenged the County's document retention practices in CEQA proceedings.

The petition explicitly referenced the earlier litigation successfully challenging the CAP. It asserted the revised CAP, adopted by the County after the invalidation of the earlier version, continued to violate state law. Specifically, the CAP did not satisfy Mitigation Measure CC-1.2, related to GHG emissions, contained in the Program Environmental Impact Report (PEIR) for the County's 2011 General Plan Update. Sierra Club explained that because that litigation was not resolved, it was necessary to challenge the County's approvals of these developments as well.

The petition asserted the approvals were invalid because they failed to adequately mitigate the GHG emissions that would be created by the projects. The petition contended the GHG mitigation measures adopted by the County for the projects were not sufficient to satisfy either CEQA or the General Plan because they allowed for GHG emission offsets outside of the County and because "[v]erification of the amount [of the offsets] and the efficacy of these offsets need be shown only 'to the satisfaction' of the [County's] Director of PDS, without written or duly adopted standards for determining such satisfaction."

The County certified the administrative record on August 12, 2019, and it was lodged with the trial court shortly after. Thereafter, the parties submitted briefing on the petition. Before the hearing on the petition on January 27, 2020, Sierra Club and the Otay 250 developers informed the court they had reached a settlement. The initial hearing took place on

8

January 27, 2020 as scheduled and was continued for the court to receive additional briefing on the impact of the Otay 250 settlement. The continued hearing took place on February 21, 2020. After additional argument from the parties, the trial court took the matter under submission.

On April 27, 2020, the court issued a minute order granting Sierra Club's petition for writ of mandate and directing the County to set aside its approvals of the Harmony Grove and Valiano projects. The court agreed with Sierra Club that the GHG mitigation measures "violate CEQA because [they] are inconsistent with the General Plan and fail to comply with CEQA's standard for ensuring the mitigation is fully enforceable." The court rejected Sierra Club's claims that the County had violated Government Code section 65358, which prohibits excessive General Plan amendments, and denied Sierra Club's claim the approvals should be set aside because the County's document retention policy resulted in deletion of documents required for the court's CEQA review.

The County, Harmony, and Integral filed notices of appeal from the court's minute order, which directed the preparation of a final judgment in the matter.[5] On June 12, 2020, this court issued its opinion in *Golden Door II*, concluding the GHG emission mitigation measure contained in the CAP, titled M-GHG-1, violates CEQA because it "lacks objective criteria to ensure the [PDS] Director's exercise of that discretion will result in GHG reduction that is real, permanent, quantifiable, verifiable, enforceable, and additional." (*Golden Door II, supra*, 50 Cal.App.5th at p. 525.) We also held the measure violated CEQA because it improperly deferred mitigation. (*Ibid.*)

---

[5] This court exercises its discretion to construe the notices of appeal as taken from the later entered judgment. (*Dominguez v. Financial Indemnity Co.* (2010) 183 Cal.App.4th 388, 391, fn. 1.)

On July 27, 2020, the trial court entered its final judgment in this case granting a peremptory writ of mandate directing the County to vacate its certifications of the EIRs and approvals of the Harmony Grove and Valiano projects. On February 10, 2021, the County requested dismissal of its appeal, and on February 22, 2021 this court issued an order granting the request.

## DISCUSSION

As noted, both developers challenge the judgment granting Sierra's Club petition and issuing a writ of mandate directing the County to vacate its certifications of the projects' EIRs and related approvals. However, their appellate contentions differ. Harmony asserts the GHG emission mitigation measures contained in its project EIR are consistent with our holding in *Golden Door II* and that the County's approval of the measures was supported by substantial evidence. Integral, on the other hand, concedes the mitigation measure in its project EIR is substantially the same as the CAP version invalidated in *Golden Door II*, but argues reversal and remand with directions to reinstate a modified version of the measure is the appropriate course of action. Because we conclude both projects' GHG emission mitigation measures are flawed in the same ways as the CAP version, we begin with a brief overview of CEQA and an explanation of the portions of the *Golden Door II* opinion that are relevant to our decision. We then address each developers' appellate arguments.

## I

## A

### *Overview of CEQA*

"CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage;

10

(3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382.)

The law is designed " 'to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." ' " (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944.) " ' "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " [Citation.] "With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]" The basic purpose of an EIR is to "provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." [Citations.] "Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees." ' " (*Golden Door II, supra*, 50 Cal.App.5th at pp. 503–504, quoting *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511–512.)

11

CEQA precludes public agencies from approving " 'projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects.' (Pub. Resources Code, § 21002.) 'A "mitigation measure" is a suggestion or change that would reduce or minimize significant adverse impacts on the environment caused by the project as proposed.' " (*Sierra Club v. County of San Diego* (2014) 231 Cal.App.4th 1152, 1165.) "If the agency finds that mitigation measures have been incorporated into the project to mitigate or avoid a project's significant effects, a 'public agency shall adopt a reporting or monitoring program for the changes made to the project or conditions of project approval, adopted in order to mitigate or avoid significant effects on the environment. The reporting or monitoring program shall be designed to ensure compliance during project implementation.' (Pub. Resources Code, § 21081.6, subd. (a)(1).)" (*Sierra Club v. County of San Diego,* at p. 1165.) Further, "[i]f a mitigation measure later becomes 'impracticable or unworkable,' the 'governing body must state a legitimate reason for deleting an earlier adopted mitigation measure, and must support that statement of reason with substantial evidence.' " (*Id.* at pp. 1165–1166.)

Under the CEQA Guidelines,[6] GHG emission mitigation measures must actually avoid, lessen, or rectify the impact they are intended to

_____

[6]     "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA].' (CEQA Guidelines, § 15000.) In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com'n* (2007) 41 Cal.4th 372, 380, fn. 2.)

mitigate. (Cal. Code Regs., tit. 14, § 15370.) " 'Mitigating conditions are not mere expressions of hope.' " (*Sierra Club v. County of San Diego, supra*, 231 Cal.App.4th at p. 1167.) They "must be fully enforceable through permit conditions, agreements, or other legally-binding instruments." (Cal. Code Regs., tit. 14, § 15126.4, subd. (a)(2).) The Guidelines permit off-site mitigation of GHG emissions so long as the measures are supported by "substantial evidence and subject to monitoring or reporting." (*Id.*, § 15126.4, subd. (c).) In addition, under the Guidelines, "[f]ormulation of mitigation measures shall not be deferred until some future time." (Guidelines, § 15126.4, subd. (a)(1)(B).)

B

*Golden Door II*[7]

After the trial court invalidated the County's approvals of the Harmony Grove and Valiano projects, this court issued its opinion in *Golden Door II*, concluding that the GHG mitigation measure contained in the supplemental

---

7 *Golden Door II* contains a comprehensive history and explanation of the County's efforts to meet state GHG targets and the California legislation creating those targets. (*Golden Door II, supra*, 50 Cal.App.5th at pp. 486–496.) The County's 2011 General Plan Update is a "comprehensive, long-term plan for developing unincorporated areas of the County" and it "[c]alls for reducing GHG emissions to meet state GHG targets, and requires preparation of a [CAP] to achieve this reduction." (*Golden Door II,* at p. 486.)

EIR[8] (SEIR) for the County's 2018 CAP, called M-GHG-1, was not CEQA-compliant. (*Golden Door II, supra*, 50 Cal.App.5th at p. 482.) *Golden Door II* explained the "SEIR acknowledge[d] that in-process [General Plan Amendments (GPAs)] are reasonably foreseeable, could result in significant GHG impacts and, therefore, are included in the SEIR's cumulative GHG impacts analysis." (*Id.* at p. 494.) Because the SEIR for the CAP did not account for in-process and future GPAs, to the extent such projects "would increase GHG emissions above projected CAP levels [of GHG emissions], their impact would be significant (i.e., inconsistent with the CAP)" and the

---

[8]    "CEQA authorizes the preparation of various kinds of EIRs depending upon the situation, such as the subsequent EIR, a supplemental EIR, and a tiered EIR. (Pub. Resources Code, §§ 21166, 21068.5, 21093, 21094.) Whereas the subsequent EIR and supplemental EIR are used to analyze modifications to a particular project, a tiered EIR is used to analyze the impacts of a later project that is consistent with an EIR prepared for a general plan, policy, or program. (CEQA Guidelines, § 15385; compare Pub. Resources Code, § 21166 & CEQA Guidelines, §§ 15162, 15163, 15164 [referencing "the project"] with Pub. Resources Code, § 21093 [stating that later projects may use tiering].)" (*Sierra Club v. County of San Diego, supra*, 231 Cal.App.4th at p. 1165.)

14

projects would be required to use the CAP's "M-GHG-1 to mitigate GHG emissions."[9] (*Ibid.*)

The CAP's "M-GHG-1 'requires a [future] project that increases density or intensity [of land use] above what is allowed in the [2011 General Plan Update (GPU)] to mitigate GHG emissions first through all feasible onsite design features....' Onsite design features may include 'land use and design features that reduce VMT [Vehicle Miles Traveled], promote transit oriented development, promote street design policies that prioritize transit, biking, and walking, and increase low carbon mobility choices, including improved access to viable and affordable public transportation....' If onsite design features are insufficient to fully mitigate GHG emissions, then the project may use offsite mitigation, including in some cases purchasing offset credits originating from projects anywhere in the world." (*Golden Door II, supra*, 50 Cal.App.5th at pp. 494–495, fn. omitted.)

Under the CAP's "M-GHG-1, the GPA project may mitigate GHG emissions under either of two options: The first is called 'No Net Increase.' Under this option, 'GPA project applicants shall achieve no net increase in GHG emissions from additional density above the 2011 GPU.' For example, 'if 400 residential units were allowed under the GPU and a GPA proposes 500

---

9      The *Golden Door II* opinion addresses a separate violation of CEQA based on the County's failure to analyze the cumulative GHG effects for the 21 GPAs in process at the time of the challenged SEIR. Both the Harmony Grove and Valiano GPAs were explicitly recognized in the CAP SEIR as in-process and the projects' GHG emissions and proposed mitigation strategies, including the purchase of offsets in accordance with the CAP's M-GHG-1 mitigation measure, were set forth in the CAP SEIR. (See *Golden Door II, supra*, 50 Cal.App.5th at p. 532.) For purposes of its analysis of this issue, the *Golden Door II* court "assume[d] without deciding that the GHG mitigation measure(s) in the EIRs for th[e] in process GPAs [were] lawful." (*Id.* at p. 533, fn. 39.)

residential units, the emissions for the 400 would be mitigated by implementing CAP reduction measures, thereby reducing GHG impacts from the 400 units to below significance. GHG emissions for the 100 additional units must be mitigated to zero through 'onsite design features and mitigation measures and offsite mitigation, including the purchase of carbon offset credits….'" (*Golden Door II, supra*, 50 Cal.App.5th at p. 495.)

"Option two is called 'Net Zero.' Under this option, GPA applicants shall reduce all project GHG emissions to zero. Applicants shall first demonstrate compliance with CAP measures before considering additional feasible onsite design features and mitigation measures. Offsite mitigation, including purchase of carbon offset credits, would be allowed after all feasible onsite design features and mitigation measures have been incorporated." (*Golden Door II, supra*, 50 Cal.App.5th at p. 495.) "Common to both options is the goal to reduce to zero any increases in GHG emissions over those projected in the CAP. If that occurs, CAP GHG emission forecasts are unaffected by the GPA project. Accordingly, the GPA project would be consistent with the CAP, and thus within the threshold of significance for GHG emissions." (*Id.* at p. 495.)

Sierra Club challenged the CAP on various grounds. In the trial court, it obtained a writ of mandate requiring "the County to vacate its approvals of the CAP, [the related] Guidelines for Determining Significance, and the certification of the SEIR. The court also enjoined the County from relying on M-GHG-1 during review of greenhouse gas emissions impacts of development proposals on unincorporated County land." (*Golden Door II, supra*, 50 Cal.App.5th at p. 482.) The trial court's decision was based both on its findings that (1) the CAP was inconsistent with the 2011 GPU because the GPU "required in-County GHG reductions" (*id.* at p. 498) and (2) M-GHG-1

16

violated CEQA because it had no geographic or duration limits on offset purchases, contained "an 'illusory' geographic priority," there was "no evidence that out-of-County offsets [would] be enforceable, verifiable, and of sufficient duration," and it lacked " 'standards or criteria' " for the Director of PDS to determine if a carbon offset registry "achiev[ed] the Director's ' "satisfaction" ' " and was "sufficiently 'reputable' to substitute for" those approved by the CARB for its cap-and-trade program (*id.* at pp. 503–504).[10]

On appeal, this court disagreed with the trial court's finding that the CAP was inconsistent with the 2011 GPU, but affirmed the trial court's judgment on the grounds that the GHG mitigation measure, M-GHG-1, violated CEQA in two ways (and on the grounds the CAP violated CEQA in other, additional ways). First, we held that the measure was improper because its performance standards were unenforceable. Specifically, the

_____

[10] " ' "Cap-and-trade is a market-based approach to reducing pollution. The 'cap' creates a limit on the total amount of emissions from a group of regulated sources, and generally imposes no particular emissions limit on any one firm or source." ' [Citation.] ' "The 'trade' … creates an incentive for businesses to seek out cost-effective reductions, while also encouraging rapid action to reduce emissions quickly. Regulated entities receive allowances … representing the right to emit a ton of greenhouse gas emissions. At specified intervals, regulated businesses must surrender an allowance for each ton of GHG … they release. Over time, the total amount of allowances available to all sources is reduced, meaning overall emissions from those sources must be also reduced. If an individual source does not need all of the allowances it has in a given period, it may 'bank' those allowances to surrender later or sell them to another registered party. The ability to sell allowances to other businesses that need them creates a market price for pollution reductions and an incentive for businesses to achieve the maximum reductions possible at the lowest cost." ' [Citation.] [¶] Thus, under cap-and-trade, GHG emitters may comply with the cap by purchasing GHG reductions that others achieve, called offsets. Offset credits can be produced by a variety of activities that reduce or eliminate GHG emissions or increase carbon sequestration." (*Golden Door II, supra*, 50 Cal.App.5th at p. 485.)

measure incorporates the requirements of section 38562, subdivision (d), governing the GHG cap-and-trade program administered by CARB, which requires offset credits "be issued only if the emission reduction achieved is 'real, permanent, quantifiable, verifiable, enforceable, and additional to any GHG emission reduction otherwise required by law or regulation, and any other GHG emission reduction that otherwise would occur.' "[11] (*Golden Door II, supra*, 50 Cal.App.5th at p. 506.)

The County argued that the measure was CEQA compliant because it was substantially similar to the offsets requirements for the CARB cap-and-trade program, and that the measure would "be 'effective and enforceable' because M-GHG-1 requires offsets to be purchased from registries that 'meet

---

[11] These terms are defined by regulation. " ' "Real" means … that GHG reductions … result from a demonstrable action or set of actions, and are quantified using appropriate, accurate, and conservative methodologies that account for all GHG emissions sources, GHG sinks, and GHG reservoirs within the offset project boundary and account for uncertainty and the potential for activity-shifting leakage and market-shifting leakage.' (Cal. Code Regs., tit. 17, § 95802.) ' "Permanent" means … that GHG reductions … are not reversible, or when GHG reductions … may be reversible, that mechanisms are in place to replace any reversed GHG emission reductions … to ensure that all credited reductions endure for at least 100 years.' (*Ibid.*) ' "Quantifiable" means … the ability to accurately measure and calculate GHG reductions … relative to a project baseline in a reliable and replicable manner for all GHG emission sources….' (*Ibid.*) ' "Verifiable" means that an Offset Project Data Report assertion is well documented and transparent such that it lends itself to an objective review by an accredited verification body.' (*Ibid.*) ' "Additional" means … greenhouse gas emission reductions or removals that exceed any greenhouse gas reduction or removals otherwise required by law, regulation or legally binding mandate, and that exceed any greenhouse gas reductions or removals that would otherwise occur in a conservative business-as-usual scenario.' (Cal. Code Regs., tit. 17, § 95802.)" (*Golden Door II, supra*, 50 Cal.App.5th at pp. 506–507, fn. omitted.)

the stringent requirements of … section 38562, subdivision (d)(1).' " (*Golden Door II, supra*, 50 Cal.App.5th at p. 507.)

In rejecting the County's position, this court examined in detail the process used by CARB to ensure that the offset registries it approves for its cap-and-trade program meet the requirements of section 38562, subdivision (d)(1). The process includes CARB approval of the *protocols* underlying the approved offset registries. The "CARB Protocols are designed to 'ensure that the reductions are quantified accurately, represent real GHG emissions reduction, and are not double-counted within the system.'" (*Golden Door II, supra*, 50 Cal.App.5th at p. 508.) Further, "CARB Protocols are regulatory documents. Therefore, CARB must 'provide public notice of and opportunity for public comment prior to approving any [CARB] protocols….' (Cal. Code Regs., tit. 17, § 95971, subd. (a).)" (*Id.* at p. 509.) Also of note, for offset projects outside of California, CARB's cap-and-trade program includes additional requirements through an extensive approval process called "linkage" requiring the Governor to submit specified findings to the Legislature. (*Id.* at p. 510.)

These approved protocols, we said, provide the enforcement mechanism to ensure offsets are valid and, critically, were missing from the CAP SEIR's M-GHG-1: "Unlike M-GHG-1, under cap-and-trade, it is not enough that the registry be CARB-approved. Equally important, the protocol itself must be CARB-approved. (Cal. Code Regs., tit. 17, § 95970, subd. (a)(1) & (2).) *This distinction is significant because some offset protocols administered by CARB-*

19

*approved registries are not Assembly Bill No. 32 compliant.*[12] [¶]… [¶]  The CARB Protocols are the heart of cap-and-trade offsets—but the word 'protocol' is not even mentioned in M-GHG-1.  …  For example, CARB will not approve a protocol unless its GHG reductions are permanent.  (*Id.*, § 95970, subd. (a)(1).)  If the project is to sequester carbon (e.g., planting trees), the protocol must ensure that the GHG will not be released for 100 years.  M-GHG-1 is deficient because it has no such safeguards."  (*Golden Door II, supra*, 50 Cal.App.5th at pp. 511–512, fn. omitted.)  *Golden Door II* also held that unlike the cap-and-trade protocols, M-GHG-1 had no enforcement mechanism to ensure that offsets are "*additional* 'to any greenhouse gas emission reduction otherwise required by law or regulation, and any other greenhouse gas emission reduction that otherwise would occur.' "  (*Id.* at pp. 513–514.)  The additionality requirement is critical, the decision states, " 'because if non-additional (i.e., "business-as-usual") projects are eligible for carbon [offset] then the net amount of greenhouse gas emissions will continue to increase and the environmental integrity of carbon reduction projects will be called into question.' "  (*Id.* at p. 514.)

---

12     Assembly Bill No. 32 is "California's 'landmark legislation addressing global climate change, the California Global Warming Solutions Act of 2006….' "  (*Golden Door II, supra*, 50 Cal.App.5th at p. 488.)  The law "calls for reducing GHG emissions to 1990 levels by 2020."  (*Ibid.*)  The law's mandate is incorporated into the County's development requirements by the General Plan's goals and policies, which include "the '[r]eduction of local GHG emissions contributing to climate change that meet or exceed requirements of the Global Warming Solutions Act of 2006' " and "that the County shall '[p]repare, maintain, and implement a climate action plan with a baseline inventory of GHG emissions from all sources; GHG emissions reduction targets and deadlines, and enforceable GHG emissions reduction measures.' "  (*Id.* at p. 489.)

This court's second basis for concluding the mitigation measure violated CEQA was the measure's improper deferral of mitigation. The decision explains that M-GHG-1 gives the County Director of PDS the ability to approve offset credits based on two determinations. First, the Director determines if the registry or issuing entity is CARB-approved or "reputable" and if it issues offsets that are consistent with section 38562, subdivision (d)(1). Second, the director determines whether the offsets are not available and/or not financially feasible in a location closer to the county than the GHG emission offsets. Sierra Club argued, and this court agreed, these determinations "violate[d] CEQA by improperly delegating and deferring mitigation to these future determinations." (*Golden Door II, supra*, 50 Cal.App.5th at p. 518.)

Under the CEQA Guidelines, " '[f]ormulation of mitigation measures shall not be deferred until some future time. (Guidelines, § 15126.4, subd. (a)(1)(B).) However, the specific details of a mitigation measure … may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure.' " (*Golden Door II, supra*, 50 Cal.App.5th at pp. 518–519.)

We held that the delegation and deferral in M-GHG-1 did not satisfy this requirement because the measure set only a generalized goal—no net increase or net-zero GHG emissions—the achievement of which "depends on implementing unspecified and undefined offset protocols, occurring in

21

unspecified locations (including foreign countries), the specifics of which are deferred to those meeting one person's subjective satisfaction." (*Golden Door II, supra*, 50 Cal.App.5th at p. 520.) The PDS Director is entrusted with determining "whether the proposed offset registry is 'reputable' and the protocol being implemented by the registry is 'consistent' with section 38562, subdivision (d)(1)—that is, whether the projected GHG reductions are 'real, permanent, verifiable and enforceable," but the measure "has no objective criteria for making such findings." (*Id.* at pp. 521–522.)

Golden Door II summarized the improper delegation and deferral issue succinctly: "The problem is M-GHG-1 lacks objective criteria to ensure the Director's exercise of [his or her] discretion will result in GHG reduction that is real, permanent, quantifiable, verifiable, enforceable, and additional." (*Golden Door II, supra*, 50 Cal.App.5th at p. 525.) We then held the mitigation measure's failure to comply with CEQA required invalidation of the CAP, since it's approval by the County was based on its unsupported finding that in-process GPAs (including the Harmony Grove and Valiano projects) and future GPAs would mitigate GHG emissions to zero since M-GHG-1 did not have enforceable performance standards to ensure purchased offsets were real. (*Ibid.*)

## C

### *Standard of Review*

The applicable standard of review is "nuanced. 'The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' [Citation.] [¶] The County's determinations as lead agency are reviewed for abuse of discretion. [Citation.] ' "[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual

22

conclusions unsupported by substantial evidence.” ’ ” (*Golden Door II, supra*, 50 Cal.App.5th at p. 504.)

“[W]ithin this abuse of discretion standard, review varies depending on the issue involved. ‘ “While we determine de novo whether the agency has employed the correct procedures, ‘scrupulously enforc[ing] all legislatively mandated CEQA requirements’ [citation], we accord greater deference to the agency’s substantive factual conclusions. In reviewing for substantial evidence, the reviewing court ‘may not set aside an agency’s approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,’ for, on factual questions, our task ‘is not to weigh conflicting evidence and determine who has the better argument.’ ” ’ ” (*Golden Door II, supra*, 50 Cal.App.5th at pp. 504–505.)

## II

### *The Harmony Grove Project*

Harmony contends that unlike the mitigation measure invalidated in *Golden Door II*, the GHG mitigation measure required by its project’s final EIR contains “explicit, well-defined performance standards” that “meet the *Golden Door* [*II*] standards requiring that any approved [offset] credits be permanent, quantifiable, real, additional, enforceable, and verifiable.” Harmony also argues the trial court erred because *Golden Door II* made clear that offset credits from outside San Diego County are permissible and there is no requirement in the applicable General Plan that offsets be local.

### A

### *The Offset Mitigation Measures*
### *Lack Enforceable Performance Standards*

Harmony asserts that the GHG mitigation measures contained in its EIR do not suffer from the same enforceability defect as the measure at issue

in *Golden Door II* because its measures contain the standards found absent in that case. We disagree. The measures are substantially the same. As Harmony points out, its projects' two versions of the mitigation measure, called M-GHG-1 (which applies to construction and vegetation removal related to the project) and M-GHG-2 (which applies to project operations) each contain a list of the standards that must be used to determine if an offset is allowed. The two measures begin with slightly different introductory paragraphs identifying the specific amount of carbon offsets required, followed by the list of criteria the offsets must meet.

M-GHG-1 and M-GHG-2 for Harmony Grove state that prior to the issuance of the first grading or building permit, the project applicant must provide evidence to the County's PDS that it has purchased and retired a specified amount of carbon offsets, followed by this language:

"a. The carbon offsets that are purchased to reduce GHG emissions shall achieve real, permanent, quantifiable, verifiable, and enforceable reductions as set forth in Cal. Health & Saf. Code Section 38562[, subd.] (d)(1).

b. One carbon offset credit shall mean the past reduction or sequestration of one metric ton of carbon dioxide equivalent that is 'not otherwise required' (CEQA Guidelines section 15126.4[c][3]).

c. Carbon offsets shall be purchased through a CARB-approved registry, such as the Climate Action Reserve, American Carbon Registry, or Verified Carbon Standard, or any registry approved by CARB to act as a registry under the State's cap-and-trade program. If no CARB-approved registry is in existence, then the Applicant or its designee shall purchase off-site carbon offset credits from any other reputable registry or entity, to the satisfaction of the Director of PDS.

d. The County will consider, to the satisfaction of the Director of PDS, the following geographic priorities for GHG reduction features, and off-site carbon offset projects: (1) Project design

24

features/on-site reduction measures; (2) off-site within the unincorporated areas of the County of San Diego; (3) off-site within the County of San Diego; (4) off-site within the State of California; (5) off-site within the United States; and (6) off-site internationally."

These measures include the language, some verbatim, of the measure rejected in *Golden Door II*. Subsections *a*, *c*, and *d* are taken directly from the CAP M-GHG-1, though subsection *a* is separated from its placement in subsection *d* in the CAP version, and the Harmony Grove measure adds language taken from section 38562, subdivision (d)(1)— "[t]he greenhouse gas emission reductions achieved are real, permanent, quantifiable, verifiable, and enforceable"—to the measure. In contrast, the CAP version requires the offsets to be "consistent with Cal. Health & Saf. Code section 38562[, subd.] (d)(1)." Subsection *b* of the Harmony Grove measure, which includes the additionality requirement, is absent from the CAP version.

Harmony asserts that inclusion of the statutory phrase "real, permanent, quantifiable, verifiable, additional and enforceable reductions" in the mitigation measure and the inclusion of the additionality requirement save the provision from invalidation. However, this recitation of the standards contained in section 38562, subdivision (d) does not cure the defects found in *Golden Door II*. Like the CAP version, the measures do not address the fundamental problem identified by this court, i.e., the measures contain no mechanism for actual enforcement of these standards.

Specifically, like the CAP measure, the Harmony Grove (and Valiano) GHG mitigation measures contain no protocols for ensuring the existence of or for measuring offset credits. We explained in *Golden Door II* that the protocol system used by CARB to qualify offsets from an approved registry was the "heart" of the CARB cap-and-trade program. While the Harmony Grove measures state credits are to be purchased from a CARB approved

registry (if one is available), as in the CAP version, "M-GHG-1 [and 2] say[] nothing about the protocols that the identified registries must implement. ... [¶] Unlike M-GHG-1 [and 2], under cap-and-trade, it is not enough that the registry be CARB-approved. Equally important, the protocol itself must be CARB-approved." (*Golden Door II, supra*, 50 Cal.App.5th at p. 511.) Unlike the measure here and the CAP version, the cap-and-trade version "will not approve a protocol unless its GHG reductions are permanent" and the system has "legislative safeguards … to ensure that out-of-state offsets reflect genuine GHG reductions." (*Id*. at p. 512.) The protocols used by CARB for its cap-and-trade program are the mechanism that provides enforceability for the offset mitigation measure. The recitation of the standards of section 38562, including a requirement of additionality, by the Harmony Grove mitigation measures are not a substitute for the actual enforcement mechanism of the protocols. In short, the measures lack enforceability and, therefore, they are insufficient under CEQA.

B

*Improper Delegation and Deferral of Mitigation*

As in *Golden Door II*, the Harmony Grove mitigation measures also impermissibly delegate and defer to the PDS Director the determination of whether offsets purchased by the project developers are what they purport to be. The Harmony Grove measures repeat the requirements that any offset be real, permanent, quantifiable, verifiable, enforceable, and additional, but as discussed, they do not provide any methodology to determine whether those requirements are met. Rather, the measures "allow[] the Director to determine whether any particular offset program is acceptable" at his or her discretion. (*Golden Door II, supra*, 50 Cal.App.5th at p. 520.) The measures "entrust[] to the 'satisfaction of the Director' whether the proposed offset

26

registry is 'reputable' and the protocol being implemented by the registry is 'consistent' with section 38562, subdivision (d)(1)—that is, whether the projected GHG reductions are 'real, permanent, verifiable and enforceable.' However, M-GHG-1 [and M-GHG-2 have] no objective criteria for making such findings." (*Id.* at pp. 521–522.)

Finally, as in *Golden Door II*, M-GHG-1 and M-GHG-2 contain "no objective standards for the Director to apply in determining whether offsets originating in foreign countries are real, permanent, verifiable, enforceable, and additional." (*Golden Door II*, *supra*, 50 Cal.App.5th at p. 521.) Harmony again points to the inclusion of those general standards in the measure, but the measure provides no method for the Director to determine if the standards are satisfied. As we have explained, this problem is "especially troubling" for the use of foreign offsets because "the ordinary challenges in establishing that a domestic offset protocol meets these standards are magnified in foreign countries" where the County has little ability to ensure the offsets are real. (*Ibid.*) "These uncertainties are one of the reasons that CARB limits the use of offsets in its Cap-and-Trade program to no more than 8 [percent] of the total." (*Ibid.*) Here, the PDS Director's findings of unavailability in other geographic locations could allow the applicants "to

offset *all* project GHG emissions through credits originating in foreign countries."[13] (*Ibid.*, italics added.)

Harmony cites *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059 (*Save Cuyama*) and *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359 (*Gentry*) to support its assertion that the future discretion afforded the PDS Director by the GHG mitigation measures is permissible. *Save Cuyama* addressed a challenge to a mitigation measure included in a conditional use permit for a hydraulic mining operation. The mitigation measure required the operator to conduct a semi-annual survey of the affected river bottoms and report its findings to the State's Office of Mine Reclamation and two county agencies for a determination of whether adverse impacts to the area had developed or appeared to be developing as a result of the operations, and then if necessary to confer with the county agencies to modify the operations to avoid additional impacts. (*Save Cuyama,* at p. 1065.) The plaintiff environmental organization argued the mitigation measure was improperly deferred because it did not sufficiently "spell out the criteria by which its effectiveness [would] be evaluated." (*Id.* at p. 1071.)

---

13      In its briefing, Harmony cites to explanatory statements contained in its final EIR, implying the statements are part of the final mitigation measures adopted by the County. For instance, it asserts that its EIR "required that *any* credits be affirmed by 'Independent, Qualified Third-Party Confirmation of Reduction or Sequestration,' and that the registry have 'adopted rules and procedures governing the retirement or cancellation of offsets.' " This language is taken from the document's response to a commentator's criticism that the GHG mitigation measures do not ensure enforceability because they allow the purchase of credits from registries whose protocols are adequately vetted. The cited language asserts simply that carbon offset registries, in general, undertake such an approval process, but it does not respond to the criticism that there is no way for the County to enforce such a requirement or to ensure that offsets ultimately permitted by the PDS Director will contain such safeguards.

The court rejected the argument, concluding the hydraulic impacts were sufficiently defined by the mitigation measure because it incorporated the Office of Mine Reclamation's regulatory standards, contained in its annual Surface Mining and Reclamation Act compliance review, to determine if modifications were required. (*Save Cuyama, supra*, 213 Cal.App.4th at pp. 1070–1071.) *Save Cuyama* presented a deferral of action based on objective regulatory standards. Here, in contrast, the mitigation standards "allow[] the [PDS] Director to determine whether any particular offset program is acceptable based on unidentified and subjective criteria." (*Golden Door II, supra*, 50 Cal.App.5th at pp. 520–521.)

*Gentry* also offer no support for Harmony. On the contrary, its discussion of deferred mitigation *supports* Sierra Club's position. In *Gentry*, the plaintiff "raise[d] virtually every conceivable objection under [CEQA] to the approval by [the] respondent City" of a development project, including by challenging 22 mitigation measures on the grounds they were improperly deferred. (*Gentry, supra*, 36 Cal.App.4th at p. 1367.) The court concluded all but one of the measures was not an improper deferral of mitigation because the measures either (1) did not actually contain any deferral, (2) required the developer and agency to comply with existing regulations with specific performance criteria in approving future actions required by the mitigation measures, or (3) required compliance with environmental regulations of other agencies. (*Id.* at pp. 1395–1396.)

The one improper deferral required the developer to obtain a report related to the habitat of a protected animal and comply with any recommendations developed in the future report. The court concluded this was improper because it prevented public review of a mitigation measure of a potentially significant impact. (*Gentry, supra*, 36 Cal.App.4th at p. 1396.)

The mitigation measures here, which lack objective criteria for the PDS Director's approval of offsets and thus fail to disclose the full basis for such approval, are likewise an improper deferral of required mitigation.

Finally, Harmony restates its argument in terms of substantial evidence, contending sufficient evidence supported the County's certification of the EIR. In support, Harmony quotes at length the discussion in the final EIR concerning the effectiveness of the proposed GHG emission mitigation measures. The quoted language, however, does not remedy the defects in the measures set forth herein. Rather, it is merely an explanation of what carbon offset registries are; the regulatory definitions of the terms real, permanent, quantifiable, verifiable, additional, and enforceable; and a description of several CARB-approved carbon registries. The discussion does not provide sufficient evidence of the measures' enforceability.

The Harmony Grove project's attempt to use onsite mitigation measures to reduce its operational GHG emissions is commendable. However, the offset measures proposed to counteract emissions not mitigated with installation of electric vehicle charging stations, solar power, and the like fall short of satisfying CEQA. Accordingly, we agree with the trial court that the County improperly certified Harmony Grove's final EIR.[14]

---

[14] Harmony also argues the trial court's order was in error to the extent it was based on a determination that the mitigation measures allowed the purchase of offsets originating outside of San Diego County. Sierra Club concedes that under *Golden Door II*, out of county offsets, as a general matter, may be permissible. However, as discussed further in section III, A and B, *infra*, reversal on this basis is not warranted because we affirm the trial court's determination that the measures are separately invalid under CEQA.

*The Valiano Project*

Integral asserts *Golden Door II* held that the purchase of carbon offsets originating outside of San Diego County does not violate CEQA so long as certain performance standards are met. Integral also maintains that *Golden Door II* terminated the applicability of the 2018 GPU, which the trial court held required offsets to originate within the county. For these reasons, Integral argues that the trial court's determination that M-GHG-1 violates CEQA and that the measure is inconsistent with the 2018 GPU must be reversed. As we explain, we do not agree with Integral's interpretation of *Golden Door II* or the manner Integral asserts it applies to this case.

A

*Local Offsets*

In its briefing, Integral emphasizes a statement in the *Golden Door II* opinion concerning the global nature of the climate issues that is contained in the section of the opinion holding the CAP's GHG mitigation measure is not inconsistent with the 2011 GPU. The opinion states that the GPU's carbon emission policies should be "construed in light of science," and " '[t]he global scope of climate change and the fact that carbon dioxide and other greenhouse gases, once released into the atmosphere, are not contained in the local area of their emission means that impacts to be evaluated are also global rather than local.' " (*Golden Door II, supra*, 50 Cal.App.5th at p. 501.) "Thus," we continued, "reducing or eliminating GHG emissions anywhere is a benefit." (*Ibid.*)

These statements are accurate but are not a part of the *Golden Door II* holding directly relevant to issue before this court. As described, and as Integral itself admits, *Golden Door II* invalidated the CAP's version of

M-GHG-1 because it did not provide objective performance standards to ensure that offset credits originating outside the County's jurisdiction actually delivered mitigation of the proposed developments' emissions. As the parties on appeal all agree, the fact that the offset credits originate outside the country is not in and of itself problematic. Rather, it is the mitigation measure's lack of a sufficient enforcement mechanisms to ensure the credits are actually eliminating GHG emissions that is problematic.

To bolster its argument for reversal, Integral also mischaracterizes the trial court's order granting Sierra Club's petition. Integral implies the order was based solely on the court's determination that the mitigation measures for Valiano and Harmony Grove violated CEQA because they allow offsets in foreign jurisdictions. This is not accurate. The trial court's determination that the measures violated CEQA was also based on the measure's lack of standards for ensuring it is enforceable. The trial court did find that Valiano's version of "M-GHG-1 fails to ensure the GHG offsets will occur within the County in accordance with Policy CO-20.1 of the 2018 General Plan." On appeal, however, Sierra Club does not dispute the general legality of off-site offsets under CEQA.

Further, this court is tasked with de novo review of the County's determination. Even if the court had erred by finding the measure violated CEQA because offsets may be purchased from sources originating outside the county, affirmance based on our holding in *Golden Door II* on the distinct issues of the mitigation measures' lack of enforceability and improper deferral of mitigation is appropriate. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18–19 [" 'The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of

32

its propriety.  No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.' "].)

B

*Determination of Consistency With the GPU Is Not Necessary*

Because of the litigation efforts of Sierra Club and others, the County's general plan as it relates to greenhouse gas emissions is in a state of flux.[15] Integral asserts that because *Golden Door II* resulted in the County rescinding and vacating the resolution adopting the 2018 GPU, "debate whether the 2018 GPU is applicable to the [Valiano] Project is moot" and its project "has a vested right to comply with the 2011 GPU, and not subsequent iterations, as a matter of law."  Integral further contends its mitigation measure M-GHG-1 is compliant with the earlier, purportedly operable 2011 GPU.

Sierra Club responds that the mitigation measure is inconsistent with the 2011 and 2018 GPUs, both of which require local GHG reductions. Sierra Club also argues that because the EIR for the project does not disclose the inconsistency, the County's approval violates CEQA's mandate that the approving agency disclose, analyze, and "bridge the 'analytical gap' between the Project's inconsistencies with General Plan provisions and the County's conclusion that the Project is consistent with all General Plan[] policies...."

---

[15]    Integral's request for judicial notice of the County's resolution vacating the 2018 GPU in conformance with the writ of mandate issued in *Golden Door II* is granted.  Integral's separate request for judicial notice of filings and orders issued in the trial court case underlying *Golden Door II* is denied as irrelevant.

33

As in *Golden Door II*, we conclude it is unnecessary to decide the issue of whether the Valiano M-GHG-1 mitigation measure is consistent with either the 2011 version, or the since-rescinded 2018 GPU that was invalidated in that case. Because the measure is not CEQA-compliant, "it is unnecessary to decide whether M-GHG-1 is invalid for other reasons." (*Golden Door II, supra*, 50 Cal.App.5th at p. 503; see also *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 101–102 [appellate court not required to address additional alleged defects that may be addressed in a completely different and more comprehensive manner upon subsequent CEQA review following remand].) Given the uncertainty that surrounds the status of the County's general plan as it relates to the issue of greenhouse gas emissions, we decline to weigh in on this issue at this juncture.[16]

---

[16] Integral also argues that *Golden Door II* made clear that the CAP version of the mitigation measure was not inconsistent with the 2011 GPU. This argument is an oversimplification of *Golden Door II*'s holding, which addressed the CAP's overall consistency with the GPU, not just the offset mitigation measure alone. The issue before the court was whether the measure's allowance of out of county offset purchases made the entire CAP inconsistent with the GPU's "policy to 'reduce GHG emissions *primarily* through minimizing vehicle trips and approving [sustainable] land use patterns" and its directive that the " '*primary* opportunities to reduce air quality pollutants and GHG emissions are in the urbanized areas of the County where there are land use patterns that can best support the increased use of transit and pedestrian activities….' " (*Golden Door II, supra*, 50 Cal.App.5th at pp. 501–502.) *Golden Door II* concluded the CAP was not inconsistent with those policies because the use of the word "primarily" did not mean all out of county GHG mitigation measures were excluded. (*Ibid.*) This holding does not address the arguments advanced by Sierra Club in this case, i.e., whether the mitigation measure *as implemented in these projects* is (1) inconsistent with the applicable general plan and (2) whether it was sufficiently disclosed and analyzed in the projects' EIRs.

## C

### *The Writ Relief Provided By the Trial Court*
### *Was Not an Abuse of Discretion*

Integral's final contention is that the trial court abused its discretion under section 21168.9 by issuing a writ of mandate requiring the County to decertify the EIR and vacate all of the Valiano project's entitlements. Integral asserts the court should have allowed the County to modify M-GHG-1 by way of an addendum to the EIR that adds specific performance standards for the purchase of offsets that originate outside of the county. Sierra Club responds that the relief granted by the trial court was within the bounds of its discretion. We agree with Sierra Club.

"[An] agency *initially* must certify an entire EIR before approving a project. (Cal. Code Regs., tit. 14, § 15004, subd. (a) (Guidelines) ['Before granting any approval of a project subject to CEQA, every lead agency … shall consider a final EIR']; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 394....) However, a court has additional options once it has found an agency's EIR certification noncompliant. Section 21168.9, subdivision (a) governs the writ of mandate that a court issues after 'trial, hearing, or remand from an appellate court' to remedy a CEQA violation." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2017) 17 Cal.App.5th 1245, 1252.)

Under section 21168.9, "when a court finds an agency's determination, finding, or decision does not comply with CEQA, the court must enter an order, in the form of a peremptory writ of mandate, containing one or more of three specified mandates. (§ 21168.9, subds. (a) & (b).) The first mandate is that the agency void the determination, finding, or decision *in whole or in part*. (*Id.*, subd. (a)(1).) The second mandate is that the agency suspend

35

specific project activities related to the determination, finding, or decision that could adversely affect the physical environment until the agency takes the action necessary for the determination, finding, or decision to comply with CEQA. This mandate applies only if the trial court finds the specific project activities will prejudice consideration or implementation of particular mitigation measures or project alternatives. (§ 21168.9, subd. (a)(2).) The final mandate is that the agency take the specific action necessary for the determination, finding, or decision to comply with CEQA. (§ 21168.9, subd. (a)(3).)" (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 286–287, italics added (*Preserve Wild Santee*).)

"When a court voids an agency determination 'in part,' it must make severance findings pursuant to section 21168.9, subdivision (b), to determine whether the voided portions are severable, and whether the remainder will be in full compliance with CEQA." (*Center for Biological Diversity v. Department of Fish & Wildlife, supra*, 17 Cal.App.5th at p. 1253.) A partial mandate is available only "if the trial court finds that (1) the portion or specific project activities are severable, (2) severance will not prejudice complete and full compliance with CEQA, and (3) the trial court has not found the remainder of the project to be in noncompliance with CEQA. (§ 21168.9, subd. (b).)" (*Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 287.)

"In deciding which mandates to include in its order, a trial court relies on equitable principles. [Citation.] However, the trial court may not direct the agency to exercise its discretion in a particular way and may only include the mandates necessary to achieve compliance with CEQA. (§ 21168.9, subds. (b) & (c).)" (*Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 287.)

"We review the trial court's exercise of its equitable powers for abuse of discretion." (*Ibid.*)

Integral urges us to direct the trial court to issue a writ of mandate requiring the County only "to revise M-GHG-1 to supply the necessary protocols for carbon offsets originating outside of the county in accordance with" *Golden Door II*. We decline to adopt this recommendation. As an initial matter, the trial court did not make the severance findings that are necessary for a partial writ under section 21168.9, subdivision (b).[17]

Further, we do not agree with Integral that severance is obviously appropriate. As stated, it argues severance findings are warranted because the mitigation measure can simply be revised to incorporate the requirements of *Golden Door II*, bringing the offset purchases originating outside of the county into compliance with CEQA. Sierra Club responds that severance is not appropriate because (1) voiding the EIR in its entirety is the "normal" procedure and (2) changes to the mitigation measure would impact the CEQA analysis for the rest of the project and the County's adoption of a statement of overriding considerations.

We do not agree with Sierra Club that there is no abuse of discretion because issuance of a writ mandating the agency decertify the EIR is the "normal" resolution of a successful challenge under CEQA. The statute, and the weight of authority thereunder, make clear that partial relief is available where the violation can be severed in accordance with section 21168.9, subdivision (b). (See *Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 288 ["The Legislature amended section 21168.9 in 1993 to expand 'the trial court's authority and "expressly authorized the court to fashion a remedy

---

17    No party indicates whether a request for severance findings was made in the trial court, and we detect no such request in the record.

that permits some part of the project to go forward while an agency seeks to remedy its CEQA violations." ' "]; *Center for Biological Diversity v. Department of Fish & Wildlife, supra*, 17 Cal.App.5th at p. 1252 ["Section 21168.9, subdivision (a) clearly allows a court to order partial decertification of an EIR following a trial, hearing, or remand."].)

We do, however, agree with Sierra Club's assertion that severance is not appropriate here because the GHG emission mitigation measure is intertwined with the EIR. As Sierra Club states, "upon reexamination of mitigation measure M-GHG-1, the County may conclude additional alternatives are feasible or must be analyzed. Changes to project requirements driven by changes to [the measure] might require revision to various impacts areas, including, for example, traffic and circulation and air quality impacts."

Although Integral argues the County can be directed to plug in the directive of *Golden Door II*, that decision does not contain a straightforward blueprint to fix the invalid measure. In addition, the status of the County's CAP and whether its version of M-GHG-1, which is the basis for the measures at issue here, has been brought into compliance with CEQA, replaced or eliminated is unknown. Further, if CEQA-compliant offsets are not available, then the project would likely require modifications in other areas. "Since the trial court's judgment is presumed correct, it is the appellant's burden to establish error." (*Golden Door II, supra*, 50 Cal.App.5th at p. 557.) Integral has not shown modifications to this measure would not impact other areas and can be severed easily from the EIR. Accordingly, we conclude that the remedy imposed by the trial court did not constitute an abuse of discretion.

DISPOSITION

The judgment is affirmed.  Respondent is entitled to appellate costs.


McCONNELL, P. J.

WE CONCUR:


HALLER, J.


GUERRERO, J.